BROOKHAVEN CABLE TV, INC., Capital Cablevision, Inc., Samson Cablevision Corp., Teleprompter Electronics Corporation, Warner Cable of Olean, Inc., National Cable Television Association, Inc., New York State Cable Television Association and Home Box Office, Inc., Plaintiffs-Appellees,

United States of America and Federal Communications Commission, Plaintiffs-Intervenors-Appellees,

v.

Robert F. KELLY, Chairman, Jerry A. Danzig, Vice Chairman, Michael H. Pendergast, Eli Wagner and Edward J. Wegman, Commissioners of the New York State Commission on Cable Television, Defendants-Appellants,

National Association of Regulatory Utility Commissioners, Defendant-Intervenor-Appellant.

Nos. 458, 482, Dockets 77–6156, 77–6157.

United States Court of Appeals, Second Circuit.

Argued March 8, 1978.

Decided March 29, 1978.

Stuart Robinowitz, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Robert S. Smith, Susan P. Carr and Jack A. Horn, New York City, on the brief), for plaintiffs-appellees.

Eloise E. Davies, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Paul V. French, U. S. Atty., Albany, N. Y. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., Daniel M. Armstrong, Associate Gen. Counsel, Gregory Christopher and Lauren Belvin, Counsels, F. C. C., Washington, D. C., on the brief), for intervenors-plaintiffs-appellees.

Charles A. Bradley, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., Ruth Kessler Toch, Sol. Gen. and Kenneth J. Connolly, Principal Atty., Albany, N. Y., on the brief), for defendants-appellants.

William R. Nusbaum, Deputy Asst. Gen. Counsel, Washington, D. C. (Paul Rodgers, Gen. Counsel, and Charles A. Schneider, Asst. Gen. Counsel, Washington, D. C., on the brief), for intervenor-defendant-appellant.

Before LUMBARD and OAKES, Circuit Judges, and WYZANSKI, District Judge.*

LUMBARD, Circuit Judge:

This appeal raises two questions: whether the Federal Communications Commission has the authority to preempt state and local price regulation of one aspect of cable television—specialized programming for which a per-program or per-channel charge is made—and if so, whether the FCC has adequately and effectively exercised that authority. The Northern District of New York, Port, J., finding that the FCC both possessed and had asserted the requisite authority, granted summary judgment to the plaintiffs herein, declaring that the action of the New York State Commission on Cable Television ["Commission"] seeking to impose price regulation on specialized pay cable was invalid, and enjoining defendants from attempting such regulation in the future. We affirm.

## I

Plaintiffs are five cable television operators, two trade associations and Home Box Office, a supplier of special pay cable programming. In addition, Judge Port permitted the FCC and the United States to intervene as parties plaintiff. The Commission and its members were joined as defendants by intervenor National Association of Regulatory Utility Commissioners ["NARUC"].

This action was commenced in response to New York's scheme for regulating cable TV, N.Y.Exec.Law §§ 811–831 (McKinney's 1972–1977 Supp.) (article 28). The relevant portions of article 28 are set forth in the margin.[1] The provisions in dispute here

---

* Sitting by designation.

1. **§ 815. Duties of the commission**
   The commission shall:
   (1) Develop and maintain a statewide plan for development of cable television services, setting forth the objectives which the commission deems to be of regional and state concern;
   (2) to the extent permitted by, and not contrary to applicable federal law, rules and regulations:
   (a) prescribe standards for procedures and practices which municipalities shall follow in granting franchises . . . .
   (b) prescribe minimum standards for inclusion in franchises . . . .

   .    .    .    .    .

   **§ 819. Franchise requirement**
   1. Notwithstanding any other law, no cable television system, whether or not it is deemed to occupy or use a public thoroughfare, may commence operations or expand the area it serves after April first, nineteen hundred seventy-three unless it has been franchised by each municipality in which it proposes to provide or extend service.
   2. A municipality shall have the power to require a franchise of any cable television system providing service within the municipality, notwithstanding that said cable television

sion system does not occupy, use or in any way traverse a public street. The provision of any municipal charter or other law authorizing a municipality to require and grant franchises is hereby enlarged and expanded, to the extent necessary, to authorize such franchises.
   3. Nothing in this article shall be construed to prevent franchise requirements in excess of those prescribed by the commission, unless such requirement is inconsistent with this article or any regulation, policy or procedure of the commission.

   .    .    .    .    .

   **§ 825. Rates**
   1. Except as otherwise provided in this section, the rates charged by a cable television company shall be those specified in the franchise which may establish, or provide for the establishment of reasonable classifications of service and categories of subscribers, or charge different rates for differing services or for subscribers in different categories.
   2. Such rates may not be changed except by amendment of the franchise.

   .    .    .    .    .

   5. In addition to other powers, the commission may, after public notice and opportunity for hearing, prescribe rates for cable television service . . . . .

concern the setting of rates by the state and local franchising authorities.

The sections concerning rates generated considerable confusion when promulgated in 1972, particularly with regard to special programming on cable systems. Accordingly, on March 1, 1976, the Commission issued a "Clarification of Commission Policy,"[2] which indicated (1) that no exemption or exclusion from franchising and rate approval requirements was intended for "pay," "auxiliary" or "subscription" cable services—the specialized programming at issue here; (2) that companies already providing pay cable services would not be required to amend their franchises immediately, but would have to give notice within two months to the appropriate authorities of their current rates, or face "appropriate sanctions"; and (3) that "active enforcement" of these policies would be undertaken.

Plaintiffs sought a declaration that the policies expressed in the Clarification violated the supremacy clause of the United States Constitution—because of alleged FCC preemption—as well as the first, fifth and fourteenth amendments. The district court granted summary judgment on the supremacy clause claim, and this appeal followed.

## II

■ We hold that the FCC has the authority to preempt state and local price regulation of special pay cable programming; that it has exercised this authority; and that the means it has chosen to preempt state regulation are adequate and effective.

In *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 2004, 20 L.Ed.2d 1001 (1968), the Supreme Court upheld the FCC's jurisdiction to regulate cable TV to the extent that such regulation is "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting."

■ The Court elaborated on and expanded this standard in *United States v. Midwest Video Corp.,* 406 U.S. 649, 667–68, 92 S.Ct. 1860, 1870, 32 L.Ed.2d 390 (1972), in which it approved the FCC's mandatory cable origination rules as "reasonably ancillary" to "the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and type of service." It follows that the FCC may regulate cable TV if its regulation will further a goal which it is entitled to pursue in the broadcast area.

A decision to delay all price regulation of special pay cable meets that test; a policy of permitting development free of price restraints at every level is reasonably ancillary to the objective of increasing program diversity, and far less intrusive than the mandatory origination rules approved in *Midwest Video, supra. Cf. National Association of Theater Owners v. FCC,* 136 U.S. App.D.C. 352, 362, 420 F.2d 194, 203 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970) (upholding FCC's non-regulation policy in subscription television field pending accumulation of· expertise).

Cases relied on by NARUC and the Commission are readily distinguished. In *NARUC v. FCC,* 174 U.S.App.D.C. 374, 533 F.2d 601 (1976), the court ruled that there was no nexus shown between FCC preemption of regulation of two-way non-video leased access cable channels (used for such purposes as burglar alarms) and the goal of increasing program diversity. Here a connection has been shown.

*Home Box Office, Inc. v. FCC,* 567 F.2d 9 (D.C.Cir. March 25, 1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) (Dkt. Nos. 76–1841 and –1842), overturned FCC anti-siphoning rules because of failure to demonstrate a genuine problem of siphoning broadcast programming. The FCC's regulatory goal in *HBO* was not program diversity, as here, but decreased competition.

---

2. *In re* Rates Charged by Cable Television Companies for "Auxiliary" Programming,

Docket No. 90010 (Commission on Cable Television 1976).

Finally, *Midwest Video Corp. v. FCC,* 571 F.2d 1025, No. 76–1496 (8th Cir. Feb. 27, 1978), held that the FCC's imposition of minimum public access and channel capacity standards on cable systems was improper. The court ruled that this was an attempt to do in the cable field something the FCC was specifically prohibited from doing in the broadcast area—imposing the burdens of common carriers. The far less intrusive 'regulation' proposed in the instant case is one which plainly eludes any attempt to analogize the regulation itself—rather than the underlying policy—to the broadcast area.

■ That the FCC has, in fact, sought to preempt state and local price regulation of special pay cable programming is evident from a survey of FCC pronouncements in the area since 1974:

In Section 76.31(a)(4) [of 47 C.F.R.] we require that cable systems, in order to receive a certificate of compliance, must have a franchise providing for franchisor approval of initial charges for installation and regular subscriber service. We have intentionally and specifically limited rate regulation responsibilities to the area of regular subscriber service, and we will continue to do so. We have defined "regular subscriber service" as that service regularly provided to all subscribers. This would include all broadcast signal carriage and all our required access channels including origination programming. It does not include specialized programming for which a per-program or per-channel charge is made. The purpose of this rule was to clearly focus (sic) the regulatory responsibility for regular subscriber rates. It was not meant to promote rate regulation of any kind.

After considerable study of the emerging cable industry and its prospects for introducing new and innovative communications services, we have concluded that, at this time, there should be no regulation of rates for such services at all by any governmental level. Attempting to impose rate regulation on specialized services that have not yet developed would not only be premature but would in all likelihood have a chilling effect on the anticipated development.

*Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry in Docket Nos. 20018 et al.,* 46 F.C.C.2d 175, 199–200 (1974). *See First Report and Order in Docket No. 19554,* 52 F.C.C.2d 1, 68 (1975) ("Although we have not ourselves undertaken the regulation of rates for the sale of subscription programming, we regard our prior statements concerning the regulation of subscription operations as preempting local regulation of rates as well as program content."); *Notice of Inquiry in Docket No. 20767,* 58 F.C.C.2d 915 (1976).

■ Finally, we do not believe that the FCC's choice to proceed by means of policy statements and interpretations rather than formal regulations vitiates its attempt to preempt. The policy to preempt has been shouted from the rooftops, *see Schwartz v. Texas,* 344 U.S. 199, 202–03, 73 S.Ct. 232, 97 L.Ed. 231 (1952), and the FCC has explicitly indicated its intent that there be no price regulation whatever of the relevant area, *see Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 773–74, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). The Commission and NARUC both participated in the 1974 proceedings cited above, and had ample opportunities to attempt to persuade the FCC to their point of view—which they did—and to take an appeal when they failed—which they did not.

*

■ Accordingly, we are satisfied that FCC preemption has rendered invalid New York's attempt to impose price regulation on special pay cable programming, and that the injunction was properly issued.

Affirmed.