TOWN OF NORWOOD & another [1] *vs.* ADAMS-RUSSELL CO., INC.

Norfolk. November 3, 1987. — February 11, 1988.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil,* Summary judgment. *Community Antenna Television Systems. Municipal Corporations,* Contracts. *Federal Preemption.*

In an action by a town seeking to roll back a cable television rate increase, summary judgment was properly entered for the town where it demonstrated there was no factual dispute that the "cable system" was not "initially fully constructed and energized" two years before the disputed rate increase went into effect, in violation of the license granted by the town. [680-683]

Neither the Cable Communications Policy Act of 1984, which transferred the regulation of cable television systems from local or State to Federal control, nor the decisions of the Federal Communications Commission preempted the authority of a town to regulate cable television rates in 1985 under circumstances where the town's authority to regulate "basic cable service" rates was preserved under the act through December 29, 1986, and where the twenty-station service whose rate the town sought to regulate under the provisions of the cable contract was a "basic cable service" as defined in the act. [683-685]

CIVIL ACTION commenced in the Superior Court Department on August 28, 1985.

The case was heard by *Ernest S. Hayeck,* J., on a motion for partial summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James C. Heigham* (*Stephen R. Latham* with him) for the defendant.

*Bruce A. Singal* (*Philip Sussler* with him) for the plaintiff. ·

LIACOS, J. The defendant, Adams-Russell Co., Inc. (Adams-Russell), the company licensed to provide cable televi-

[1] The board of selectmen of the town of Norwood.

sion services to the town of Norwood (town), instituted a rate increase for its "Expanded 52" tier of cable service, effective September 1, 1985. The town and its board of selectmen (board) brought suit seeking to prevent, or, thereafter, roll back, the rate increase.[2] The complaint alleged breach of the "rate freeze" provision of the license (count 1) and violation of G. L. c. 93A (1986 ed.) (count 2). The plaintiffs moved for summary judgment on both counts of the complaint. The parties filed affidavits and briefs, and a hearing was held on the motion. Summary judgment was granted as to count 1, pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). The judge deferred ruling on count 2 and on the relief to be granted on the judgment for count 1. Adams-Russell appealed the partial summary judgment, and we transferred this case from the Appeals Court on our own motion.[3] We affirm the entry of partial summary judgment.

In 1980, the board began seeking a company to provide cable television services to the town. A number of companies, including Adams-Russell, responded to the town's advertisements by submitting proposals. The board reviewed the proposals and chose Adams-Russell. A provisional license was issued to Adams-Russell on September 22, 1981; a final license was issued on July 27, 1982.

The final license contained a schedule of rates. The rates varied depending on the type of service chosen by a subscriber. For example, the "Basic 20" service, which provided reception of signals from local stations as well as from two "Super Stations" (WTBS from Atlanta, Georgia, and WOR from New York City), was scheduled in the final license to cost $4.50 a

---

[2] The plaintiffs initially sought to enjoin the rate increase, but a preliminary injunction was denied on August 30, 1985. The rate increase went into effect on September 1, 1985.

[3] Procedurally, the judge properly entered partial summary judgment. There is no right to trial by jury for G. L. c. 93A actions, *Nei* v. *Burley,* 388 Mass. 307 (1983); thus, an affirmance on appeal of the summary judgment on count 1 would obviate the need for a jury trial. Our resolution of the questions raised on appeal will expedite the trial of the remaining claims. *J.B.L. Constr. Co.* v. *Lincoln Homes Corp.,* 9 Mass. App. Ct. 250, 252 (1980), and cases cited.

month. The "Expanded 52" service (later known as "Supercable" service), which provided the "Basic 20" service and service from additional stations such as Music Television (MTV), Sports Network (ESPN), and Cable News Network (CNN), was scheduled in the final license to cost $7.50 a month. The final license also contained a two-year rate freeze provision. Section 31(e) of the final license stated: "*Rate Freeze*: The Licensee agrees that it will not change the schedule of monthly rates for all cable and Pay TV services for at least twenty-four (24) months after the cable system is initially fully constructed and energized. When this construction is complete, Licensee shall request certification of complete construction from the Issuing Authority or its Designee which shall be granted promptly upon submission by the Licensee to the Issuing Authority or its Designee a map of the Town of Norwood showing that construction of plant has passed all residences in the Town of Norwood existing, as of the date of the Final License, and has been fully activated. . . ."

Adams-Russell began construction of the system in the fall of 1982. As of September 1, 1983, all public rights of way in the town had been wired. However, cable television service was not available to residents in some large, privately owned apartment complexes until some time after May, 1985. The systems manager of Adams-Russell in Norwood, Jay Somers, asserted that uncooperative landlords, and other factors beyond Adams-Russell's control, caused the delays in providing service to those areas.

In May, 1984, in accordance with the rate freeze provision of the license (§ 31[e]), Adams-Russell certified to the town that "[a]erial construction was completed by September 1[, 1983,] and underground construction was completed December 31[, 1983]." Adams-Russell requested a "Certification of Complete Construction" and indicated that it would supply a map of completed construction. The map was never supplied, and a "Certification of Complete Construction" was never issued.

The "institutional loop," a "network [providing] two-way interconnection between all schools, private institutions,

municipal buildings, houses of worship, and doctors' offices located along the institutional network" was to be constructed as a part of the cable system. As of February, 1985, a number of schools and houses of worship were still not connected to the loop.

On July 25, 1985, Adams-Russell wrote to the board announcing its intention to raise rates for the "Supercable Tier" from $7.50 a month to $14.50 a month, effective September 1, 1985. The cost of the "Basic 20" service remained at $4.50 a month. This litigation followed.

*Breach of the rate freeze provision.* Adams-Russell argues that summary judgment should not have been entered on count 1 because there exist genuine disputes of material fact as to whether Adams-Russell complied with the rate freeze provision. Specifically, Adams-Russell contends that there are disputes over when "the cable system [was] initially fully constructed and energized," whether the "institutional loop" was a part of the cable system required to be "initially fully constructed and energized," and whether factors beyond Adams-Russell's control caused the delay in completing the cable system.

Rule 56 (c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), provides that a judge shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." " [A]ll doubt as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment." *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982), quoting *Gross* v. *Southern Ry.,* 414 F.2d 292, 297 (5th Cir. 1969). "[T]he moving party must affirmatively show that there is no real issue of fact." *Hub Assocs.* v. *Goode,* 357 Mass. 449, 451 (1970). Applying the above principles to the facts in this case, our inquiry focuses on whether the judge erred in determining that the town affirmatively demonstrated that there was no factual dispute as to its contention that the "cable system" was not "in-

itially fully constructed and energized" as of September 1, 1983, two years before the rate increase went into effect.

Section 1(d) of the final license defines the "Cable System" as: "[A] facility which receives and amplifies the signals broadcast by one or more television stations and redistributes such signals through *Residential and Institutional systems* to subscribing members of the public for a fixed or periodic fee, employing wires, amplifiers, cables and/or optical fibers passing along, over, under, across and upon streets, ways, lanes, alleys, parkways, bridges, highways and other public places, including property over which the Town has an easement of right-of-way and including facilities which in addition to providing such reception, amplification and redistribution, are also used to originate and distribute programs or other material to such subscribers; and in particular, the cable system to be constructed and operated in the Town of Norwood in accordance with the terms and conditions of this license" (emphasis supplied).

Adams-Russell, in its request for certification of complete construction, admitted that the underground construction of the cable system was not completed until December, 1983. Adams-Russell does not refute that fact but argues that all of the public rights of way in Norwood were wired and ready for service by September 1, 1983. The rate freeze provision requires a two-year moratorium on rate increases after the "cable system" is "initially fully constructed and energized." The cable system is not defined in the license as being limited to aerial construction along public rights of way, but includes "wires, amplifiers, cables and/or optical fibers passing . . . *under* . . . streets, ways, lanes, alleys, parkways, bridges, highways and other public places" (emphasis supplied).

In addition, the town demonstrated that there was no factual dispute that the institutional loop was not "initially fully constructed and energized" by September 1, 1983. Adams-Russell argues that the rate freeze provision does not require that the institutional loop be completed because the rate freeze applies only to residential rates, and the institutional loop is a separate closed-circuit, two-way television communication system that

is provided without charge. In contrast, the definition in the final license of the "Cable System" includes "a facility which receives and amplifies . . . and redistributes [the] signals through Residential and Institutional systems." Clearly, the institutional loop is a part of the cable system and, as such, must have been completed by September 1, 1983, in order for the rate increase not to have violated the rate freeze provision.

Adams-Russell contends that factual disputes exist regarding whether the town caused the delays in the completion of the cable system. Adams-Russell points to delays in the town's director of public works' issuance of underground work permits and delays in "make ready" work needed on poles for the aerial system. The rate freeze provision unconditionally states that Adams-Russell will not raise rates for two years after the system is "initially fully constructed and energized." This is in marked contrast to the conditional language in other sections of the license. For example, § 7 of the final license, dealing with the commencement of service, states: "From the time that cable service is ready and available to subscriber applicants, . . . service shall be provided to all such applicants on a first come first serve basis within 30 days of such application [therefor]. Licensee shall use its best efforts to comply within the 30 days; but Licensee shall not be bound thereto if the delay is due to factors beyond the reasonable control of Licensee." Section 6 of the final license contains similar conditional language. The absence of conditional language in § 31(e), when it is present in other sections of the same document, indicates that the parties did not intend any conditions to apply. See *School Comm. of Brockton* v. *Teachers' Retirement Bd.*, 393 Mass. 256, 262-263 (1984); *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982). Thus, under § 31(e), a factual dispute as to who caused delays has no bearing on when a rate increase could take place.

The town affirmatively showed that the cable system was not "initially fully constructed and energized" two years before the rate increase took effect. The remaining factual disputes regarding whether privately owned apartment complexes received service and whether certain streets were extant on the date of the issuance of the final license, and therefore part of

the cable system, are not material to the dispute. The town need not prove that *no* factual disputes exist, only that there is no *genuine* dispute of *material* fact. *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248-249 (1986). See *Attorney Gen.* v. *Bailey, supra* at 370, quoting *H & M Cake Box, Inc.* v. *Bakery & Confectionery Workers, Int'l Union, Local 45,* 454 F.2d 716, 719 (1st Cir. 1972) ("court should only 'determine whether genuine issue of material fact exist[s]' ").

*Federal preemption.* Adams-Russell argues that the judge erred in granting partial summary judgment because control over all nonbasic cable television rates has been federally preempted by statute, the Cable Communications Policy Act of 1984 (Cable Act), 47 U.S.C. §§ 521-559 (Supp. III 1984), and by the Federal Communications Commission (FCC), and thus are not subject to local control.

The Cable Act of 1984 provides in § 543(a): "Any Federal agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section." The statute contains a "grandfather clause," 47 U.S.C. § 543(c) (Supp. III 1984),[4] which deals with situations where a franchise was already in effect prior to the effective date of the Act, December 29, 1984 ("sixty days after the date of enactment [October 30, 1984]").[5] Section 543(c) provides in pertinent part: "In the case of any cable system for which a franchise has been granted on or before the effective date of this subchapter, until the end

---

[4] Congress enacted this "grandfather clause" even though, since 1974, the FCC had sought to preempt State and local price regulation of certain pay cable programming. "[W]e have concluded that, at this time, there should be no regulation of rates for [certain] services at all by any governmental level." Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry, 46 F.C.C.2d 175, 199 (1974). See *In re Community Cable TV, Inc.* (*Community I*), 95 F.C.C.2d 1204 (1983). See *Brookhaven Cable TV, Inc.* v. *Kelly,* 573 F.2d 765 (2d Cir. 1978), cert. denied, 441 U.S. 904 (1979).

[5] The final license in this case was issued on July 27, 1982.

of the 2-year period beginning on such effective date, the franchising authority may, to the extent provided in a franchise — (1) regulate the rates for the provision of basic cable service, including multiple tiers of basic cable service . . . ." Thus, the validity of Adams-Russell's claim that Congress had preempted the regulation of rates depends on whether Adams-Russell's "Supercable" tier constitutes "basic cable service, including multiple tiers of basic cable service."

Section 522 (2) of the Cable Act defines "basic cable service" as "any service tier which includes the retransmission of local television broadcast signals."[6] Adams-Russell argues that "basic cable service" means the $4.50 (Basic 20) tier which provides local television broadcast signals and two distant television broadcast signals. We do not read the statutory definition so narrowly. The Supercable tier retransmits local television broadcast signals. The additional stations (beyond the "Basic 20") are not offered at a separate rate and cannot be purchased independently from the local stations. The "Supercable" tier is "basic cable service." Under the grandfather clause of the Cable Act, the town was able to regulate the rates for the Supercable tier until December 29, 1986, two years after the effective date of the statute and more than one year after the increase of the rate for the Supercable tier.

Adams-Russell argues that the FCC, through a series of decisions, has adopted a policy that has the consequence of preempting the authority of State and local governments from exercising regulatory rate controls over cable television services, other than rates for basic subscriber service. Adams-Russell cites a number of cases in support of its proposition: *Brookhaven Cable TV, Inc.* v. *Kelly,* 573 F.2d 765 (2d Cir. 1978), cert. denied, 441 U.S. 904 (1979); *In re Community Cable TV, Inc.* (*Community I*), 95 F.C.C.2d 1204 (1983); *In re Community Cable TV, Inc.* (*Community II*), 98 F.C.C.2d

---

[6] A "service tier" is defined in 47 U.S.C. § 522(14) as "a category of cable service or other services provided by a cable operator and for which a separate rate is charged by the cable operator." The Supercable tier service fits the definition of a service tier. See *Westwood* v. *Adams Russell Co.,* 24 Mass. App. Ct. 914, 916 (1987).

1180 (1984). The cases cited by Adams-Russell deal with State and local authorities enacting legislation after the cable system was in place, seeking to regulate for an unlimited time the rates of cable television. Both the *Community I, supra,* and *Community II, supra,* cases deal with Nevada's comprehensive legislation for cable television. Nev. Rev. Stat. c. 711 (1985). The Public Service Commission of Nevada (PSC) proposed an order that contemplated rate regulation by the PSC. Similarly, in *Brookhaven, supra,* the New York Commission on Cable Television attempted to regulate the rates charged for specialized programming for which a per-program or per-channel charge was made. In each of these cases, a State or local governmental entity was attempting to fix, or control permanently, the rates of an already existing cable system.

In the case at bar, the town is seeking to enforce a time-limited provision in a license. The provision was proposed by Adams-Russell and was relied on by the town in choosing Adams-Russell as the cable television provider. The town is not enacting any regulation that would give the town permanent control over the rates charged for cable television service, but seeks the enforcement of a contractual provision as specified in the final license. This it has the right to do. See *Mayor of Salem* v. *Warner Amex Cable Communications, Inc.,* 392 Mass. 663, 669 (1984).

The cases cited by Adams-Russell take cognizance of the FCC's policy of allowing the nascent industry of cable television to grow and to develop without the stifling imposition of myriad State, local, and Federal regulations. Clarification of the Cable Television Rules and Notice of Proposed Rulemaking and Inquiry, 46 F.C.C.2d 175, 176, 199-200 (1974). These cases, however, do not deal with the transitional period from local to Federal control as stated in § 543(c) of the Cable Act. The policy of the FCC would not be furthered or impaired by invalidating a preexisting, mutually agreed upon license provision allowing a time-specific rate freeze.

*Conclusion.* The town affirmatively established for summary judgment purposes that the "cable system" was not "initially fully constructed and energized" two years before Adams-Rus-

sell's rate increase went into effect. Neither the Cable Act nor the FCC decisions preempt the town from enforcing a time-limited, mutually agreed upon, rate freeze provision. The partial summary judgment is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*