**MISSOURI–KANSAS–TEXAS
RAILROAD COMPANY,
Appellant,**

v.

**HERITAGE CABLEVISION OF
DALLAS, INC., Appellee.**

No. 05–88–01469–CV.

Court of Appeals of Texas,
Dallas.

Dec. 14, 1989.

274

John B. Kyle, Susan Stoler, Dallas, for appellant.

Mark M. Donheiser, Terri M. Anigian, Dallas, for appellee.

Before HOWELL, ROWE and KINKEADE, JJ.

## OPINION

ROWE, Justice.

Heritage Cablevision of Dallas, Inc. sued Missouri–Kansas–Texas Railroad Company under the Federal Cable Communications Policy Act of 1984 (the Act) seeking injunctive and declaratory relief. After a bench trial, judgment was entered in favor of Heritage, and a permanent injunction was ordered enjoining MKT from removing or interfering with Heritage's cable lines located within public rights-of-way on MKT's property. In five points of error, MKT asserts that certain licenses it granted to Heritage's predecessor still obligate Heritage to pay compensation for the privilege of crossing MKT's trackbeds, and that the Act, even if applicable to these licenses, does not abolish Heritage's obligation to compensate for this right. We overrule all points of error and affirm the trial court's judgment.

The City of Dallas, as franchising authority, granted a cable franchise to Warner Amex Cable Communication, Inc. in 1980. Between 1981 and 1983, MKT and Warner Amex executed approximately forty-four communication line license agreements allowing Warner Amex to install aerial and underground cable television lines along or across MKT railroad trackbeds and public rights-of-way. Warner Amex paid MKT $2,500 under each license agreement. Each agreement had a five year term and a

renewal option. If any license was not renewed, the agreement required Warner Amex to remove all cable lines and restore the right-of-way to its prior condition.

In 1985, Heritage Communications, Inc. purchased Warner Amex's cable franchise. In addition, Warner Amex assigned the license agreements to Heritage Communications. Later that year, Heritage Communications transferred the cable franchise and license agreements to Heritage Cablevision Associates of Dallas, L.P., of which Heritage is the sole general partner.

In 1986 and 1987, Heritage renewed sixteen of the license agreements with MKT. In 1988, Heritage allowed twelve license agreements to expire. When MKT sought to have the cable lines removed, Heritage filed suit seeking injunctive and declaratory relief based on rights claimed under the Act. 47 U.S.C.A. § 541 (West Supp.1989). The parties stipulated that ten of the agreements involved public rights-of-way.

The trial court held that, under the Act, Heritage was entitled to utilize without charge the cable crossings within those ten crossings stipulated to be public rights-of-way.

The court permanently enjoined MKT from removing or interfering with Heritage's cable lines at those crossings for so long as Heritage complied with the reciprocal obligations imposed upon it by the Act.

### GRANDFATHERING EFFECT

■ In its second point of error, MKT contends that the Act is not applicable to cable systems already in place at the time of its enactment, basing this contention on a broad interpretation of two sections of the Act. *See* 47 U.S.C.A. §§ 544(c), 557(a) (West Supp.1989). MKT reads sections 544(c) and 557(a) as grandfathering not only preexisting franchises but also private agreements made by the franchisees such as the licenses granted to Heritage by MKT. We disagree.

MKT reasons that the original franchise to Warner Amex and its assignee Heritage predated the Act; therefore, the franchise became subject to the grandfather provisions, allowing all of its terms to remain in effect after the Act took effect. MKT applies the same analysis to the license agreements since they were executed in favor of Warner before the Act and were later transferred by Warner to Heritage. Even accepting this interpretation of the Act's grandfathering provisions, this analysis fails because the ten license agreements in this case have expired. Except for the right to enforce the removal of the cable lines and restoration of the rights-of-way to their previous condition, MKT has no enforceable rights under the expired agreements. Consequently, the only benefit to MKT grandfathered under this interpretation would be removal of the lines and restoration of the rights-of-way to their previous condition.

Heritage had the contractual right to allow each license to expire. Once terminated under this provision of the agreement, the licenses themselves can no longer be enforced either by contract or by statute. Even if some portions of the license agreements remain enforceable after expiration, MKT's reliance on the grandfather provisions in sections 544(c) and 557(a) is misplaced.

■ Section 544(c) states that "[i]n the case of any franchise in effect on the effective date of this subchapter, the franchising authority may, ... enforce requirements contained within the franchise for the provision of services, facilities, and equipment, whether or not related to the establishment or operation of the cable system." 47 U.S.C.A. § 544(c). Franchising authority is defined in section 522(9) as "any governmental entity empowered by federal, state, or local law to grant a franchise." 47 U.S.C.A. § 522(9) (West Supp. 1989). While section 544(c) does have the grandfathering effect of enforcing requirements contained within franchises preexisting the effective date of the Act, enforcement of the grandfathering is expressly limited to the franchising authority. The City of Dallas is the franchising authority, not MKT. Therefore, MKT cannot enforce the license agreements under section 544(c).

Furthermore, section 544(c) limits enforcement to "requirements contained within the franchise." 47 U.S.C.A. § 544(c). The private license agreements between Heritage's predecessor, Warner Amex, and MKT were not a part of the franchise which Dallas granted to Warner Amex in 1980. Instead, Warner Amex entered into these contracts with MKT between 1981 and 1983. As private contracts between the cable operator and a railroad, the licenses do not fall within the category of "requirements contained within the franchise."

Section 557(a) states that "[t]he provisions of (1) any franchise in effect on the effective date of this subchapter, including any such provisions which relate to the designation, use, or support for the use of channel capacity for public, educational, or governmental use, and (2) any law of any state ... or any regulation promulgated pursuant to such law, which relates to such designation, use or support of such channel capacity, shall remain in effect, subject to the express provisions of this subchapter, and for not longer than the then current remaining term of the franchise as such franchise existed on such effective date." 47 U.S.C.A. § 557(a). In other words, section 557(a) authorizes the grandfathering of the provisions in a franchise including those relating to public, educational, and governmental use of cable capacity and state laws and regulations relating to channel capacity. Like section 544(c), section 557(a) addresses franchise provisions. This section expressly grandfathers "[t]he provisions of a franchise." 47 U.S.C.A. § 557(a). Again, the private license agreements were not a provision of Heritage's franchise. Therefore, the licenses are not enforceable under section 557(a).

Legislative history supports the interpretation that only franchise provisions and state laws or regulations are subject to the Act's grandfathering provisions. In explaining section 557, the House Report states that this section "grandfathers the terms of any franchise." H.R. REP. No. 934, 98th Cong., 2d Sess. 94, *reprinted in*

1984 U.S.CODE CONG. & ADMIN.NEWS 4655, 4731.

In discussing the issue of federal preemption of state cable regulation, a federal district court also addressed section 557(a), concluding that it was created as a transition mechanism to provide continuing effectiveness to existing franchise terms and existing state laws that do not conflict with the express provisions of the Act. *Housatonic Cable Vision Co. v. Department of Public Utility Control*, 622 F.Supp. 798, 809 (D.Conn.1985). Congressional intent, according to the court, was not to displace with the enactment of the Act all existing regulatory arrangements between cable operators and franchising authorities. *Id.* MKT does not seek to enforce an existing franchise term, state law, or state regulation; therefore, section 557(a) is inapplicable.

The House Report also specifically addressed the use of public rights-of-way. Congress considered private arrangements restricting a cable operator's use of rights-of-way or compatible easements to violate the provisions of the Act authorizing the construction of cable systems on public rights-of-way. *See* 47 U.S.C.A. § 541(a)(2). The Report further states that such restrictive arrangements would be unenforceable. H.R.REP. No. 934, 98th Cong., 2d Sess. 59, *reprinted in* 1984 U.S.CODE CONG. & ADMIN. NEWS 4655, 4696. As previously noted, the licenses at issue in this case are private arrangements between MKT and Heritage and are not within the terms of Heritage's franchise.

To support its contention that the license agreements should be grandfathered, MKT relies on the decisions by two courts that grandfathered line extension requirements mandated by state law and a two-year rate freeze provision required by the franchising authority in the original franchise. *Housatonic*, 622 F.Supp. 798; *Town of Norwood v. Adams–Russell Co.*, 401 Mass. 677, 519 N.E.2d 253 (1988).

In the *Town of Norwood*, the franchising authority sought to enforce a two-year rate freeze provision contained in the franchise. *Town of Norwood*, 401 Mass. at 648, 519

N.E.2d at 257. The court rejected the cable operator's argument that the Act preempted the rate freeze because the rate freeze did not exceed the extent of rate regulation permitted by the Act. *Id.* Pursuant to section 543(a) which provides that "[a]ny franchising authority may regulate the rates for the provision of cable service ... to the extent provided under this section," the court held that the franchising authority could still enforce the rate freeze. *Id.* at 683–84, 519 N.E.2d at 256–57. The franchising authority had statutory authority under section 543(a) to enforce the rate freeze. In contrast, MKT does not have statutory authority to enforce the license agreements.

The *Housatonic* court concluded from an analysis of section 544(c) and similar provisions in the Act that Congress did not remove the state's power, as franchising authority, to legislate and enforce line extension requirements. *Housatonic*, 622 F.Supp. at 807. Contrary to MKT's assertion that the line extension requirements and the license agreements should be similarly grandfathered by the Act, the license agreements cannot be grandfathered. The line extension provision was required by state law, and the party in court seeking to enforce the provision was the franchising authority. The license agreements between MKT and Heritage are private contracts. Furthermore, the City of Dallas, as the franchising authority, is not seeking to enforce the license agreements. As a result of these differences, the license agreements are not subject to being grandfathered on the same basis as were the line extension requirements in the *Housatonic* case.

MKT does not have the statutory authority under the Act to invoke the grandfather clauses. In addition, the grandfather benefit is limited to franchise terms, state laws and regulations, and does not extend to private agreements such as the licenses granted to Heritage by MKT. We conclude, therefore, that the license agreements between MKT and Heritage cannot be grandfathered under the Act and overrule MKT's second point of error.

## RIGHT OF ACCESS

■ In three points of error, MKT contends generally that it is due compensation for Heritage's right of access to the public rights-of-way. Specifically, in its first point of error, MKT argues that the Act as a matter of law does not abolish Heritage's obligations to pay compensation pursuant to the licenses or to remove its cables upon expiration of the licenses. MKT's fourth point of error states that the Act does not prohibit or excuse the payment of compensation by Heritage for the privilege of crossing MKT's public rights-of-way. In its fifth point of error, MKT alleges that the trial court's conclusion that the Act excused Heritage's performance pursuant to the licenses was an unconstitutional application of the Act because it effected a taking of MKT's property without just compensation. At oral argument, however, we understood MKT to concede that the use by Heritage does not rise to the level of a constitutional taking. Consequently, we do not consider MKT's fifth point of error. We consider the merits on MKT's first and fourth points of error, and, for reasons given below, we conclude that the Act does grant Heritage the right of access to MKT's public rights-of-way without compensation for that right.

The primary function of courts in construing legislation is to effectuate legislative intent. *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Legislative intent may be ascertained from the clear language of the statute itself or from available legislative materials which clearly reveal this intent. *Arnett v. Security Mut. Fin. Corp.*, 731 F.2d 358, 361 (6th Cir.1984). Absent a clearly expressed legislative intent to the contrary, the plain language must ordinarily be regarded as conclusive. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

The United States Congress enacted the Act in 1984 to provide a national policy clarifying the system of local, state, and federal regulation of cable television. H.R.

REP. No. 934, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.CODE CONG. & ADMIN. NEWS 4655, 4656. Congress intended for the Act to encourage the growth and development of cable systems. *Id.* Accordingly, section 541(a)(2) grants cable franchisees the authority to construct cable systems over public rights-of-way and through easements dedicated to compatible uses. 47 U.S.C.A. § 541(a)(2). Section 541(a)(2) further requires the cable operator to guarantee the safety, functioning, and appearance of the property and to pay costs and damages related to the installation, construction, operation, and removal of all cable facilities within the rights-of-way and easements. *Id.* Specifically, the Act provides:

§ 541. **General franchise requirements**

(a) **Authority to award franchises; construction of cable systems over rights-of-way and through easements; conditions for use of easements; equal access to service**

. . . .

(2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure—

(A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;

(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and

(C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.

47 U.S.C.A. § 541(a)(2) (West Supp.1989).

The Act expressly authorizes a franchised cable operator to construct its cable lines over public rights-of-way and easements dedicated to compatible uses. 47 U.S.C.A. § 541(a)(2). Heritage is a franchised cable operator seeking to maintain cable lines located within public rights-of-way. We agree with MKT's concession that the Act does grant Heritage a statutory right of access across that portion of MKT's property which is within a public right-of-way. We cannot agree, however, that under the Act a special compensation must be paid by Heritage to MKT for such right.

Although the express language of this statute provides for a right of access, there is no express language requiring compensation for that right. Even though the statute is silent as to the cable operator's obligation to pay compensation for the right of access, the statute does obligate the cable operator to compensate for damage caused to the property by the placement of the cable systems. 47 U.S.C.A. § 541(a)(2)(C). Section 541(a) further requires the cable franchisee to guarantee the safety, functioning, and appearance of the property and to pay costs related to the installation, construction, operation, or removal of the cable facilities. 47 U.S.C.A. § 541(a)(2)(A)–(B). Congress could have required cable operators to pay compensation for access, but it did not. This failure is persuasive evidence that Congress did not intend cable operators to pay for the right of access.

A complete review of the legislative history discloses that Congress had initially considered a broader compensation scheme for this Act. The House Bill listed a fourth obligation requiring compensation for the value of the property taken from multi-unit dwelling owners to the extent such owners were subjected to a mandatory access provision. H.R.REP. No. 934, 98th Cong., 2d Sess. 80–81, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS 4655, 4717–18. Congress deleted the requirement for mandatory access to multi-unit dwellings out of concern for the United States Supreme Court decision striking down, on constitu-

tional grounds, a New York State cable television statute that required landlords to give cable operators access to their property without compensation. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). When the mandatory access requirement was deleted, Congress also deleted the section providing compensation for the value of the property. *Cable Investments, Inc. v. Woolley*, 867 F.2d 151, 158 (3rd Cir.1989).

Several courts have recently addressed the question of compensation for right of access with regard to easements dedicated to compatible uses. The Third Circuit concluded that the requirement in section 541(a)(2)(C) that owners be "justly compensated" by the cable operator for any damages was unrelated to the compensation for right of access, basing this conclusion on the deletion of the multi-unit dwelling section. *Id.* Although cable operators had been granted access to easements dedicated for compatible uses, the *Woolley* court noted that this access alone would not give the cable operator complete access to tenants of multi-unit dwellings since at some point the cable lines must cross the owner's property outside of any easements. *Id.* at 155. Therefore, the court held that the access provisions in section 541 did not grant access to private property *outside* of the easements; otherwise, Congress would have provided for compensation. *Id.* at 159.

The Georgia Court of Appeals, in affirming a condemnation award for a utility easement which did not include any payment for right of access by the local television cable operator, stated that, under the Act, "a cable television franchise [sic] has a free ride to attach to existing easements with compatible uses." *Montgomery v. City of Sylvania*, 189 Ga.App. 515, 376 S.E.2d 403, 405 (1988). The court held, therefore, that a cable operator could continue without charge to maintain cable lines within the easement because the condemnee had not contested the amount of the condemnation award. *Montgomery*, 376 S.E.2d at 405.

MKT's reliance on two federal district court decisions is misplaced because these courts did not require compensation for the right of access to compatible easements and public rights-of-way. *See Greater Worcester Cable Vision, Inc. v. Carabetta Enterprises, Inc.*, 682 F.Supp. 1244, 1259 (D.Mass.1985); *Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI Ltd., Inc.*, 678 F.Supp. 871 (N.D.Ga.1986). *The Greater Worcester* court concluded that section 541(a)(2)(C), which provides just compensation for damages, would include compensation for value if the cable operator's use of the easement or public right-of-way amounted to "an additional servitude on the underlying property." *Greater Worcester*, 682 F.Supp. at 1259. According to the court, "[i]f no additional burden is imposed, no taking of property will occur." *Id.* The court concluded that the present damages section would insure that the property owners were compensated for any taking that occurs. *Id.*

MKT interprets *Greater Worcester* to hold that the damages provision compensates for any use of the public right-of-way or easement. However, the court explicitly stated that there would not be a taking without a burden additional to or incompatible with the public right-of-way or easement imposed on the property. The court in *Cable Holdings* agreed with *Greater Worcester* that the compensation for damages section would provide compensation for any taking that occurs. *Cable Holdings*, 678 F.Supp. at 874.

We conclude that the Act grants Heritage the right of access to MKT's public rights-of-ways without compensation; and, accordingly, we overrule MKT's first and fourth points of error.

### WAIVER

■ MKT also seeks to enforce the license agreements by waiver. According to MKT's third point of error, Heritage waived its right to rely on the benefits of the Act with regard to the ten license agreements at issue by renewing sixteen other license agreements in 1986 and 1987 after Congress passed the Act in 1984.

A waiver takes place when one dispenses with the performance of something that he has a right to exact, or when one in possession of any right, whether conferred by law or contract, with full knowledge of the material facts, does or forbears to do something, the doing or forbearing of which is inconsistent with the right. *Ford v. Culbertson*, 158 TEX. 124, 138–39, 308 S.W.2d 855, 865 (1958). Waiver is defined generally as the intentional relinquishment of a known right or conduct which warrants the inference of relinquishment of a known right. *FDIC v. Attayi*, 745 S.W.2d 939, 946 (Tex.App.—Houston [1st Dist.] 1988, no writ). The elements of waiver include: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct. *Id.* The right or privilege granted by statute may also be waived or surrendered by the party to whom or for whose benefit it is given. *United Benefit Fire Ins. Co. v. Metropolitan Plumbing Co.*, 363 S.W.2d 843, 847 (Tex.Civ.App.—El Paso 1962, no writ).

In support of its position, MKT relies on a case holding that any complaint of defect in a promissory note was waived by acts taken by a subsequent purchaser with respect to the property securing the note, including taking possession, claiming ownership, mortgaging the property, and obtaining a partial release of a lien on the property. *Rosestone Properties, Inc. v. Schliemann*, 662 S.W.2d 49, 53 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.). In *Rosestone*, the subsequent purchaser sought to invalidate the same promissory note under which possession of the property was claimed. *Id.* In contrast, MKT would have us extrapolate the rights it held under ten license agreements because of action which Heritage had taken with regard to sixteen different license agreements. We decline to do so. Each agreement, while similar in nature and content, grants a discrete right with respect to a unique property. Thus, each license is enforceable independently of the other licenses. Accordingly, as to the ten licenses at issue in this case, we hold that Heritage did not lose its right to rely on benefits of the Act by its renewal of the sixteen other license agreements.

## CONCLUSION

MKT opposed the granting of injunctive and declaratory relief for Heritage on the basis that the ten license agreements at issue were still needed to cover the obligations of the parties. As discussed, this Court concludes that MKT can no longer require the charge for right of access which these license agreements exact from Heritage. Accordingly, the injunctive and declaratory relief sought by Heritage was properly granted. MKT also sought to recover those costs it would incur in removing Heritage's cable line from its rights-of-way. We agree that by contract MKT is entitled to the removal of the cable lines and restoration of the rights-of-way to their previous condition and that the cost of removal and restoration is to be borne by Heritage. For this Court to grant the relief contractually owed to MKT, however, the cable lines would be removed only to be immediately reinstalled pursuant to the rights granted to Heritage by the Act. "A court of equity will not require the doing of a useless thing, nor will it lend its powers to accomplish a useless purpose." *Boman v. Gibbs*, 443 S.W.2d 267, 272 (Tex.Civ.App.—Amarillo 1969, writ ref'd n.r.e.); *Davis v. Carothers*, 335 S.W.2d 631, 642 (Tex.Civ.App.—Waco 1960, writ dism'd by agr.). Under the circumstances appearing in this record, to order Heritage to remove its presently installed lines would serve no useful purpose. Instead, it would likely inconvenience many innocent cable customers who were intended to be benefitted under the Act. For these reasons, we affirm the trial court's injunction prohibiting removal of the lines.

The judgment of the trial court is affirmed.