FIRST INTERSTATE BANK OF ARIZONA, N.A., Plaintiff–Appellee,

v.

INTERFUND CORPORATION, Defendant–Appellant.

No. 90–8188.

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1991.

Rehearing Denied April 3, 1991.

---

Lawrence B. Shallcross, Jr., San Antonio, Tex., for defendant-appellant.

Aubrey R. Williams, Pakis, Cherry, Beard & Giotes, Waco, Tex., for plaintiff-appellee.

Before GOLDBERG, KING and DUHÉ, Circuit Judges.

GOLDBERG, Circuit Judge:

Interfund Corporation ("Interfund") appeals a judgment entered against it in the amount of $200,000, in favor of First Interstate Bank of Arizona, N.A. ("First Interstate"). Interfund and First Interstate are competing creditors of Bentwood Farms, Inc. ("Bentwood"), a large Arabian horse farm near Waco, Texas. First Interstate sued Interfund for conversion and unjust enrichment, after First Interstate sent Interfund a promissory note and a horse registration certificate because Interfund was considering purchasing the note. Interfund declined to purchase the paper, but instead of returning these documents to First Interstate, it retained the paper as additional security for under-secured paper it had previously purchased from Bentwood. The jury found that this act constituted conversion and unjust enrichment. We affirm the judgment of the district court.

## I. FACTS AND PROCEEDINGS BELOW

In the early and mid-eighties, First Interstate was one of the largest lenders to the Arabian horse industry in the United States. In November 1984 First Interstate entered into a loan agreement with Bentwood. This agreement originally included a six million dollar line of credit documented by a six million dollar promissory note and a security agreement (the "General Security Agreement"). The General Security Agreement granted First Interstate a security interest in, among other things, Bentwood's chattel paper and inventory, including its horses.[1]

In conjunction with this loan agreement, Bentwood executed several financing statements which were originally filed with the Texas Secretary of State and the McLennan County Clerk on December 10, 1984. Subsequent financing statements were filed on January 24, 1986 and December 12, 1986. All of these financing statements covered Bentwood's chattel paper and horses, and they specifically listed any horses which were excluded from First Interstate's security base.

When Bentwood sold a horse, the buyer always signed three documents simultaneously: a purchase and sale agreement, a promissory note, and a security agreement. By virtue of its General Security Agreement, First Interstate had a security interest in these documents. As horses were sold and chattel paper executed, Bentwood assigned and sent this chattel paper to First Interstate, requesting an advance of funds according to a set formula contained in the loan documents. First Interstate would then advance funds on some, but not all, the contracts. The loan agreement between Bentwood and First Interstate established the criteria for such "eligible" contracts. The remaining, ineligible contracts were nevertheless also held by First Interstate as additional collateral for the money First Interstate advanced to Bentwood.

### A. *The Crook Contract*

In November 1986 Bentwood Farms entered into a contract with William H. Crook (the "Crook Contract") whereby Crook agreed to purchase the horse AK Kadira, one of the horses in which First Interstate had a perfected security interest, for $100,-000. The Crook Contract is the subject of this lawsuit. In conjunction with the purchase of AK Kadira, Crook signed a purchase and sale agreement, a promissory note and a security agreement. By virtue of its General Security Agreement and financing statements, First Interstate had a first lien security interest in the Crook chattel paper. Therefore, Bentwood assigned the Crook chattel paper to First Interstate on December 2, 1986. Under the loan agreement, the Crook contract was an "ineligible" contract so First Interstate did not advance Bentwood any funds at this time.

On December 1, 1986, Bentwood filed the security agreement it received from Crook, which specifically granted Bentwood a security interest in AK Kadira. On January 2, 1987, Bentwood filed a UCC–3, assigning this interest to First Interstate. First Interstate simultaneously released its general security interest in AK Kadira.

### B. *The Crosson Contract*

Before the Crook Contract was executed, Bentwood was in technical and financial default to First Interstate, owing First Interstate approximately fourteen million dollars. As part of its attempt to help Bentwood repay its debt, First Interstate suggested that Bentwood sell its ineligible contracts to third parties. Therefore, in the summer of 1986, Bentwood contacted Interfund, a specialty finance company which was organized for the primary purpose of funding equine operations by acquiring purchase money security interest contracts.

On August 1, 1986, Bentwood and Interfund executed a Master Assignment Agreement (the "Interfund Master Assignment Agreement"). The Interfund Master Assignment Agreement defined the manner in which Bentwood could sell contracts to Interfund. It also allowed Interfund to retain additional Bentwood property to se-

---

**1.** This line of credit was apparently eventually increased to fourteen million dollars.

cure Bentwood's debt to Interfund. Shortly after signing this agreement, Interfund purchased the Crosson Contract from Bentwood for $191,000. The Crosson Contract evidenced the sale of an Arabian horse, AK Nariffa, to Thomas and Maggie Crosson for $228,000. AK Nariffa was one of the horses specifically excluded from First Interstate's General Security Agreement.

After Interfund purchased the Crosson Contract, the Crossons repudiated the contract. In February 1987, Bentwood resold AK Nariffa to two Canadians. Interfund agreed to substitute the Canadian's Contract for the Crosson Contract. Due to the problems with the original Crosson Contract, Bentwood guaranteed the Canadians' performance. Subsequently, the Canadians also defaulted on their contract.

### C. Interfund and the Crook Contract

On January 7, 1987, Bentwood requested that First Interstate return the Crook note so that Bentwood could forward it to Interfund, who was interested in purchasing the Crook chattel paper. After First Interstate returned the Crook note, Bentwood forwarded it to Interfund. When Bentwood forwarded the note to Interfund, it was still endorsed to First Interstate. This exchange of chattel paper was apparently in accord with industry custom and practice.

On January 23, 1987, First Interstate sent a letter to Interfund, together with the original certificate of registration from the Arabian Horse Registry of America ("AHR"), regarding AK Kadira. This letter described First Interstate's understanding that Interfund planned to purchase the Crook chattel paper, and asked that if Interfund did not do so, that it return the Crook documents.

In a subsequent letter dated February 23, 1987, First Interstate sent Interfund an unrecorded UCC–3 by which Interfund could release First Interstate's interest in AK Kadira. This UCC–3 was necessary to release the interest that First Interstate acquired in AK Kadira when Bentwood assigned its interest to First Interstate on January 2, 1987. In its cover letter, First Interstate reiterated its understanding that

Interfund was purchasing the Crook Contract, and requested that Interfund return all of the Crook documents to First Interstate if the purchase was not completed by March 4, 1987.

On March 31, 1987, during a telephone conversation, a representative of First Interstate informed Interfund that in order to complete the purchase of the Crook chattel paper, Interfund would need First Interstate to endorse and assign the Crook note to Interfund. Therefore, Interfund sent the Crook note to First Interstate so that First Interstate could endorse the note over to Interfund. First Interstate endorsed the note without conditions and returned it to Interfund on April 3, 1987, together with a cover letter indicating that First Interstate understood that Interfund would be purchasing the Crook Contract.

On April 24, 1987, First Interstate sent Interfund a letter formally requesting the return of the original AHR certificate on AK Kadira, the unrecorded UCC–3, and the Crook note, endorsed back over to First Interstate. Interfund did not directly respond, but instead on May 4, 1987, Interfund recorded the UCC–3 assigning First Interstate's interest in AK Kadira to Interfund. On May 6, 1987, First Interstate sent Interfund another letter requesting return of the original Crook documents. Instead of responding to this letter, on May 8, 1987, Interfund sent the original registration certificate concerning AK Kadira to the Arabian Horse Registry of America, which then issued a new certificate showing Interfund as the owner of record.

Interfund never purchased the Crook Contract, but it also never returned any of the Crook documents, despite First Interstate's repeated requests for their return. Indeed, after obtaining the documents, Interfund never responded to First Interstate's correspondence. At trial, Interfund maintained that all documents were held pursuant to the unrecorded Interfund Master Assignment Agreement, as additional collateral due to the Canadians' default on the Crosson Contract.

In October 1988, First Interstate filed this suit, alleging conversion and unjust

enrichment, and seeking actual and punitive damages. The jury found for First Interstate and awarded $100,000 in actual and $100,000 in punitive damages. Interfund now appeals this decision.

## II. DISCUSSION

### A. *Standard of Review*

Interfund's arguments in this case are tied to the factual record. It contends that the jury reached its conclusions based on insufficient evidence. We must first consider the scope of our review.

■ The judgment in this case became final when the district court denied Interfund's motion for judgment notwithstanding the verdict or a new trial. We review denials of motions for a new trial under an abuse of discretion standard. *Melear v. Spears*, 862 F.2d 1177, 1182 (5th Cir.1989). In substance, however, Interfund is asking us to reverse the judgment of the district court because the court let stand a jury verdict that Interfund believes is not supported by the evidence.

■ Accordingly, we review this appeal using the standard of review appropriate for review of a JNOV motion. "In reviewing ... [the denial of a motion for judgment notwithstanding the verdict] our inquiry matches the inquiry undertaken by the trial court in passing on [the motion]." *Id.* (quoting *Keyes v. Lauga*, 635 F.2d 330, 334 (5th Cir.1981)). We must determine whether the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could not arrive at a contrary verdict. *Id.*

### B. *Conversion*

■ Interfund argues that its possession of the documents allegedly converted was lawful and proper. Under Texas law, "[c]onversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Tripp Village Joint Venture v. MBank Lincoln Centre*, 774 S.W.2d 746, 750 (Tex.App.—Dallas 1989, writ ref'd). Interfund contends that its retention of the Crook chattel paper was lawful due to the

Interfund Master Assignment Agreement, which contained a provision giving Interfund the right to hold and apply any of Bentwood's property that came into its possession.

The fatal flaw in Interfund's argument is that First Interstate had a prior, perfected security interest in the Crook chattel paper. When William Crook purchased the horse AK Kadira from Bentwood, he executed a purchase and sale agreement, a promissory note and a security agreement. Under the Texas Business and Commerce Code these documents taken together constitute chattel paper because they represent both a monetary obligation and a security interest in specific goods. *See* Tex.Bus. & Com. Code Ann. § 9.105(a)(2) (Vernon Supp. 1990).

While a security interest in an "instrument," such as a promissory note, can only be perfected by possession, a security interest in chattel paper may be perfected by filing or by possession. *See* Tex.Bus. & Com.Code Ann. §§ 9.304(a), 9.305. First Interstate originally perfected its interest in all of Bentwood's horses and chattel paper when it filed its financing statements on December 10, 1984. At that time, AK Kadira was included as part of First Interstate's collateral. In addition, First Interstate further perfected its interest in the Crook chattel paper by actually taking possession of it on December 2, 1986.

On January 2, 1987, First Interstate filed a UCC–3 releasing its general security interest in AK Kadira. Bentwood, however, simultaneously filed a UCC–3 assigning its specific security interest in AK Kadira to First Interstate. By means of this UCC–3, Bentwood assigned to First Interstate its security interest in AK Kadira, which it had received when Crook executed his security agreement. Therefore, First Interstate's security interest in AK Kadira and the Crook chattel paper was continuously perfected. *See* Tex.Bus. & Com.Code Ann. § 9.303(b) ("If a security interest is originally perfected ... and is subsequently perfected in some other way ..., without an intermediate period when it was unperfected, the security interest shall be per-

fected continuously for the purposes of this chapter.") Therefore, First Interstate's interests in the Crook chattel paper were clearly superior to any interests Interfund acquired through its subsequent, unrecorded Master Assignment Agreement. *See* Tex.Bus. & Com.Code Ann. §§ 9.301(a), 9.312(e)(1) (Conflicting security interests rank according to priority in time of filing or perfection.)[2]

Although First Interstate concedes that Interfund initially came into lawful possession of the Crook chattel paper, First Interstate argues Interfund converted the chattel paper when it refused First Interstate's repeated demands for the return of those documents. First Interstate's first formal demand for the return of the Crook chattel paper was made in a letter to Interfund dated April 24, 1987. Texas law does provide that one in lawful possession of another's property may become liable for conversion upon a demand and a refusal to deliver such property. *Norris v. Bovina Feeders, Inc.*, 492 F.2d 502, 506 (5th Cir.1974); *Johnson v. Lane*, 524 S.W.2d 361, 364 (Tex. Civ.App.—Dallas 1975, no writ). Since we have already established that First Interstate's interest in the Crook chattel paper was superior to Interfund's interest, we conclude that the evidence does support the jury's conclusion that Interfund converted the Crook chattel paper when it refused First Interstate's request to return the paper.

### 1. Consent

 Interfund contends that the evidence introduced at trial was insufficient to establish that First Interstate did not consent to the taking of the Crook chattel paper. As reflected in the district court's jury instructions, in order to maintain a successful conversion claim, First Interstate needed to establish that it did not

expressly or implicitly consent to Interfund's possession of the documents in question. *See Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir.1988). Based on our review of the record, we hold that there was ample evidence in the record to establish lack of consent.

First Interstate returned the Crook note to Bentwood so that Bentwood could attempt to secure Interfund's financing of this transaction. After Bentwood forwarded the note to Interfund for its review, First Interstate delivered the remaining Crook chattel paper to Interfund, in accordance with custom and practice among lenders. First Interstate carefully included cover letters with these documents which described the conditional nature of such delivery, and its expectations that Interfund would return the documents if Interfund chose not to purchase the note in question. First Interstate subsequently and timely demanded return of the documents. Since First Interstate made its expectations regarding Interfund's possession of the Crook chattel paper clear from the start, the mere fact that First Interstate acquiesced to the initial transfer of these documents to Interfund does not prove that First Interstate consented to Interfund's retention of possession without purchasing these documents. Therefore, a reasonable jury could certainly conclude that First Interstate had not consented to Interfund's retention of the Crook chattel paper.

### 2. Waiver

 As an affirmative defense to the conversion claim, Interfund asserts that First Interstate waived its right to the Crook chattel paper, and therefore waived its right to bring a conversion claim based on Interfund's possession of those doc-

---

**2.** Neither did Interfund acquire a superior interest in the Crook chattel paper under section 9.308 of the Texas Business and Commerce Code. Section 9.308 provides that "[a] purchaser of chattel paper who gives new value and takes possession of it in the ordinary course of his business has priority over a security interest ... perfected under Section 9.304 ... if he acts without knowledge that the specific paper ... is

subject to a security interest." Tex.Bus. & Com. Code Ann. § 9.308(1). Although Interfund came into possession of the chattel paper in the ordinary course of its business, it arguably did not advance any new value for the paper. In addition, Interfund concedes in its brief that it was aware that First Interstate had a previously perfected security interest in the Crook chattel paper.

uments. Under Texas law, waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Edwin M. Jones Oil v. Pend Oreille Oil,* 794 S.W.2d 442, 447 (Tex.App.—Corpus Christi 1990); *see also Ford v. Culbertson,* 158 Tex. 124, 138–39, 308 S.W.2d 855, 865 (1958). The elements of waiver are: (1) an existing right, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct. *Missouri–Kansas–Texas R.R. v. Heritage Cablevision of Dallas, Inc.,* 783 S.W.2d 273, 280 (Tex.App.—Dallas 1989, no writ).

■ Under Texas law, waiver is a valid defense to an action to enforce a security interest. *Montgomery v. Fuquay–Mouser, Inc.,* 567 S.W.2d 268, 270 (Tex.Civ.App.—Amarillo 1978, no writ); *see also MBank Alamo Nat'l Ass'n v. Raytheon Co.,* 886 F.2d 1449 (5th Cir.1989). The Texas version of the Uniform Commercial Code specifically provides for the express waiver of a security interest. *See* Tex.Bus. & Com. Code § 9.306(b) ("A security interest continues in collateral notwithstanding the sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise....").

■ Generally, waiver is a fact question turning on the question of intent. *Lang v. Lee,* 777 S.W.2d 158, 164 (Tex.App.—Dallas 1989, no writ). "Intention is a prime factor in determining the question of waiver. The acts, words or conduct relied upon to establish intention must be such as to manifest an unequivocal intention to no longer assert the right." *Weisbart & Co. v. First Nat'l Bank of Dalhart,* 568 F.2d 391 (5th Cir.1978) (quoting *Athens Comm'n Co. v. Lufkin Livestock Exchange, Inc.,* 439 S.W.2d 427, 430 (Tex.Civ. App.—Beaumont 1969, writ ref'd n.r.e.)). Courts will only imply a waiver to prevent fraud or inequitable consequences. *Id.*

■ Interfund contends that the district court erred in not ruling in favor of Interfund as a matter of law on the issue of waiver. Citing *Lang,* 777 S.W.2d at 164,

Interfund argues that the district court should have treated waiver as an issue of law because the facts and circumstances of the transaction were clearly established. Unfortunately, the *Lee* court does not explain what standard to employ when determining whether the facts and circumstances have become clearly established. An earlier Texas decision, however, held that the issue of waiver becomes a matter of law only where material facts and circumstances are undisputed or clearly established and there is no room for argument or inference. *Herider Farms—El Paso Inc. v. Criswell,* 519 S.W.2d 473, 478 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r. e.).

We hold that the district court correctly treated the issue of waiver as a fact question for the jury to decide because there was ample evidence in the record from which a reasonable person could infer that First Interstate never intended to waive its security interest in the Crook chattel paper or in AK Kadira. In this case the jury determined that First Interstate had not waived its security interest in the Crook collateral or in AK Kadira.

As we stated earlier, the testimony at trial established that First Interstate directly, or indirectly through Bentwood, furnished Interfund the Crook documents for review in accordance with industry practice. At all times it was First Interstate's belief that Interfund would either purchase these documents, or return them to First Interstate. Although Interfund originally received Crook's promissory note from Bentwood, at that time the note was endorsed to First Interstate, not Interfund. It was not until April 1987 when First Interstate believed Interfund was going to purchase the Crook chattel paper that First Interstate endorsed the note in favor of Interfund. In addition, First Interstate expressly made the use of the AHR certificate on AK Kadira and the unrecorded UCC–3 release conditional on Interfund's purchase of the pertinent promissory note. Therefore, the record supports the jury finding that First Interstate never inten-

tionally relinquished its security interest in the Crook chattel paper.

### C. *Punitive Damages*

■ Finally, Interfund argues that this court should reverse the jury's verdict because the record does not support the jury's award of punitive damages. Under Texas law, the fact that an act is unlawful is not of itself grounds for an award of exemplary or punitive damages. *Killian v. Trans Union Leasing Corp.*, 657 S.W.2d 189, 193 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (quoting *Ogle v. Craig*, 464 S.W.2d 95, 97 (Tex.1971)). Punitive damages are only available if the unlawful act warranting the actual damages was of a wanton and malicious nature. *Transfer Prod. v. Texpar Energy*, 788 S.W.2d 713, 715 (Tex.App.—Corpus Christi 1990, no writ); *Courtesy Pontiac, Inc. v. Ragsdale*, 532 S.W.2d 118, 121 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.).

■ Malice may be actual or implied. *Texpar Energy*, 788 S.W.2d at 715. Actual malice is characterized by ill will or intent to injure. *Id.* Implied malice exists when wrongful conduct is intentional and without just cause or excuse. *Accent Builders v. Southwest Concrete Sys.*, 679 S.W.2d 106, 111 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). While a good faith pursuit of a claimed right cannot support an award of punitive damages, *Exxon Corp. v. Bell*, 695 S.W.2d 788, 790 (Tex.App.—Texarkana 1985, no writ), a court may imply malice when the defendant knew or should have known it had no legal right to the property. *First Nat'l Bank of McAllen v. Brown*, 644 S.W.2d 808, 810 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

■ We hold that there is sufficient evidence in the record for a reasonable jury to have held that Interfund's actions were "willful and wanton, and maliciously done."[3] Interfund knew that First Interstate had a prior, perfected security interest in most of Bentwood's horses and Bentwood's chattel paper. Interfund also knew that prior to its implicit representation that

it was purchasing the Crook chattel paper, the Crook note was endorsed and assigned to First Interstate. In addition, Interfund knew or should have known that even though First Interstate had released its general interest in AK Kadira, it still had a perfected security interest in AK Kadira by virtue of Bentwood's recorded UCC–3, assigning to First Interstate its interest in AK Kadira which it had acquired from Crook. Furthermore First Interstate's correspondence with Interfund clearly indicated that it retained its security interest in the Crook chattel paper until Interfund purchased this paper. In light of all these facts, a reasonable jury could have implied malice on the part of Interfund and properly awarded punitive damages.

### III. CONCLUSION

We have examined the equine that Interfund presented for our inspection. Finding it to be a nag, not a thoroughbred, we dutifully relegate it to its proper stall. Therefore, we AFFIRM the district court's denial of Interfund's Motion for JNOV or new trial. On the issue of conversion, we find that a reasonable jury could have determined that First Interstate had a superior interest in the Crook chattel paper, and that First Interstate neither consented to Interfund's continued possession of this chattel paper, nor waived its security interest in the paper. In addition, we affirm the award of punitive damages, finding after our review of the record that a reasonable jury could have determined that Interfund converted the Crook chattel paper when it knew or should have known that it had no legal right to continued possession of the paper. We have carefully considered Interfund's other points of error and find them without merit.

---

3. R. 281, Special Interrogatory Number Five.