**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-10652
(Summary Calendar)

In re GGM, P.C., formerly known as
GEARY GLAST & MIDDLETON, P.C.,

Debtor.

MARK J. ZIMMERMANN,

Appellant,

versus

JOHN JAMES JENKINS, Trustee,

Appellee.

Appeal from United States District Court
for the Northern District of Texas

February 10, 1999

Before KING, Chief Judge, BARKSDALE and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge.

This case requires us to consider the district court's affirmance of a final judgment entered

against Defendant-Appellant Mark J. Zimmermann ("Zimmermann") by the Bankruptcy Court for the

Northern District of Texas. Zimmermann was the subject of an adversary proceeding brought by

Plaintiff-Appellee John James Jenkins ("Jenkins" or "Trustee"), the Trustee of the bankruptcy estate

of GGM, P.C., f/k/a Geary, Glast & Middleton, P.C. ("GGM"), a dissolved law firm. Zimmermann was a GGM director, shareholder, and officer. The Trustee sued Zimmermann to collect on a promissory note ("Note") that Zimmermann executed in 1989[1] in favor of Texas Commerce Bank, N.A. ("TCB") when he purchased shares in GGM.[2] After trial, the bankruptcy court concluded that Zimmermann was liable to GGM, through its Trustee, for the principal amount and accrued interest due on the Note. The district court, finding no reversible error, affirmed the judgment of the bankruptcy court. We likewise find no cause to reverse the judgment of either court below and thus affirm the judgment of the district court.

## BACKGROUND

I.  *Zimmermann's Employment and the TCB Financing*

In December 1988, Zimmermann was extended an offer to join GGM. Upon accepting the offer, in March 1989, Zimmermann became a shareholder and director of GGM when he purchased shares in the law firm, which was then a professional corporation. At that time, GGM had set the amount of capital contribution required of its shareholders at $50,000. In exchange for this purchase,

---

[1] The Note has been renewed and extended at least twice since 1989. One of these renewals occurred in March 1991, when Zimmermann executed a promissory note, in the principal amount of $48,727.63, payable to TCB. A second renewal occurred in March 1992, when Zimmermann executed a promissory note in the principal amount of $48,697.67. The indebtedness due on that Note matured in March 1993 and is fully due and payable at present. That March 1992 Note was subsequently sold to the bankruptcy estate of GGM and is the one referred to in this opinion as the "Note."

[2] At the time that Zimmermann joined the firm and executed the Note, the firm was known as Baker, Mills & Glast, P.C. It was later called Baker, Glast & Middleton, P.C. Through a merger of professional corporations, it finally emerged as GGM. We will refer to the firm as GGM throughout this opinion for clarity's sake.

2

Zimmermann received shares of stock in the firm.  In order to finance this purchase, Zimmermann executed the Note with TCB; he was required by TCB to pledge his shares in GGM as collateral.

In connection with the purchase of shares and the execution of the Note, GGM and TCB executed a Repurchase Agreement ("Repurchase Agreement") in March 1989, the purpose of which was to give additional assurance to TCB that the loan was well-collateralized and to ensure that the shares of stock were not possessed by anyone not a member of the law firm.[3]  Under the Repurchase Agreement, GGM agreed to repurchase the shares from TCB in the event of Zimmermann's default under the Note upon "receipt of written notice of default in payment of the Note and failure by [Zimmermann] to cure such default within the applicable period set out in the Note."

II.    *The GGM Shareholder Agreement*

When Zimmermann pledged his shares in GGM to TCB, he did so pursuant to an agreement among the shareholders of GGM and the law firm ("Shareholders' Agreement").  This agreement permitted the firm's shareholders to pledge their shares in the law firm in connection with the financing of the initial purchase of their shares or the refinancing of that initial purchase as long as the creditor agreed to be bound by the restrictions on transferability which limited re-sale of the shares. This Shareholders' Agreement also provided that, in the event of default by the pledging shareholder, GGM would have the ability to acquire the shares.

This Shareholders' Agreement was superseded in April 1991 by a second agreement ("Second Shareholders' Agreement").  The Second Shareholders' Agreement tracked the previous Shareholders' Agreement with respect to GGM's ability to repurchase shares pledged as collateral.

---

[3] GGM and TCB executed several Repurchase Agreements related to GGM's shareholders' capital contributions.

The purpose of the Second Shareholders' Agreement was, like its predecessor, to require the law firm to repurchase the shares upon the occurrence of certain events and to limit the sale of the shares by the shareholders. The Second Shareholders' Agreement also provided that, upon termination of employment, the law firm was obligated to "purchase with its surplus to the extent such surplus is lawfully available" the shareholders' shares. The purchase of these shares was to be paid within six months of the termination. Significantly, the Second Shareholders' Agreement also expressly provided for the agreement to terminate upon several occurrences, one of which was the dissolution of the law firm. At the time the Second Shareholders' Agreement was executed, Zimmermann, in addition to remaining a Director and Shareholder in GGM, had become its Vice President.

III.     *GGM's Dissolution and the Bankruptcy Proceeding*

At least twice during 1992, GGM did not have sufficient funds to pay its directors' compensation, although it continued to pay its salaried employees and associate attorneys. When it became evident to the Board of Directors that GGM was spiraling uncontrollably toward financial collapse, they voted, on May 21, 1992, to dissolve the firm. Although Zimmermann was not present for the vote of dissolution, he participated in and voted for a dissolution plan on June 10, 1992 ("Plan of Dissolution"). That same day, GGM began the process of dissolving and winding down its business affairs. On June 14, GGM ceased the practice of law, and Zimmermann's employment with GGM was terminated.

On September 11, 1992, an involuntary Chapter 11 petition was filed against GGM by its creditors. The claims filed by creditors against the GGM estate exceeded the estate's assets, thus assuring that there would be no distribution to shareholders on their equity interests. The bankruptcy court issued an order for relief under Chapter 11 in October 1992. During the proceedings in the

4

Chapter 11 case, in May 1993, the bankruptcy court modified the automatic stay under 11 U.S.C. § 362(a) to allow TCB to pursue its rights and remedies against GGM under the Repurchase Agreements. TCB issued a notice of private sale of the shares to GGM and demanded that GGM repurchase them in accordance with the Repurchase Agreements. Instead, GGM and TCB sought and obtained approval from the bankruptcy court, in June 1993, for GGM to purchase the shareholder notes, including Zimmermann's Note, which had been in default since March 1993. Shortly thereafter, in July 1993, the case was converted to Chapter 7, and the Trustee was appointed to represent GGM's estate. The Trustee, as representative of the estate and holder of the Note, made demand on Zimmermann for payment on the Note, which he refused. In July 1996, the Trustee brought this adversary proceeding against Zimmermann to recover on the Note. The bankruptcy court conducted a bench trial in April 1997 and entered judgment in the Trustee's favor in May 1997. Zimmermann appealed the judgment to the United States District Court for the Northern District of Texas, which affirmed the bankruptcy court's judgment in April 1998. Zimmermann appealed to this court in May 1998.

## STANDARD OF REVIEW

We review the decision of the district court by applying the same standard to the bankruptcy court's findings of fact and conclusions of law as the district court applied. See In re Pro-Snax Distributors, Inc., 157 F.3d 414, 419-20 (5th Cir. 1998). A bankruptcy court's findings of fact are subject to review for clear error, and its conclusions of law are reviewed de novo. See id. at 420. We are faced both with legal and with factual issues in this appeal.

5

In his appeal to this court, Zimmermann principally argues that he did not waive his rights under the Second Shareholders' Agreement when he voted for the Plan of Dissolution. He contends that the district court "applied the wrong law" of waiver and erred in finding waiver as a matter of law. Zimmermann also suggests that he was an intended third-party beneficiary to the Repurchase Agreement between GGM and TCB. He further argues that TCB retained the collateral in full satisfaction of the debt. He devotes less space to his contentions that (1) the Trustee failed to prove conditions precedent to suit on a Note and (2) GGM and TCB violated an un-vacated order of the bankruptcy court (the "procedural arguments").

The soft-shoe approach in Zimmermann's brief to the district court's opinion and to the record below is but the first act in Zimmermann's theatrical effort to convince us that we should reverse the court below. Were we to adopt Zimmermann's colloquial style, we might review his performance as meriting "two thumbs down;" in the alternative, it is sufficient to observe that Zimmermann's brief is replete with egregious errors of grammar, syntax, and style.[4] We might be inclined to overlook these gaffes were it not that his legal argument is suffused with what we will generously call myopia: in his attempt to escape the inevitable, Zimmermann repeatedly mischaracterizes—intentionally or carelessly, we know not—the facts and the law of the case. His appeal barely escapes summary affirmance as frivolous; nonetheless, we will treat his arguments seriatim below.

---

[4] While we routinely ignore the types of isolated references to "economic carnage" and "the sins of the movers and shakers" that pepper Zimmermann's brief, we find it hard to overlook the fact that, even if we were to find that the bankruptcy court should have vacated an interlocutory order before later modifying it, such a finding would not render the case "mute," as Zimmermann argues.

I.       *Zimmermann Waived His Rights Under the Second Shareholders' Agreement*

The district court did not conclude "as a matter of law" that Zimmermann waived his rights under the Second Shareholders' Agreement; it corrected the bankruptcy court's styling of waiver as a question of law by observing that waiver is a question of fact.  See Zimmermann v. Jenkins, 1998 WL 223706, *6 (N.D. Tex. 1998); see also In re REPH Acquisition Co., 134 B.R. 194 (N.D. Tex. 1991) (holding that waiver is a question of fact).  This court has so held as well.  See First Interstate Bank v. Interfund Corp., 924 F.2d 588, 595 (5th Cir. 1991) (observing that "generally waiver is a fact question turning on the issue of intent").

Under Texas law, "waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."  Id.  Zimmermann waived whatever rights he may have had under the Second Shareholders' Agreement by voting in the affirmative for the Plan of Dissolution in June 1992 because the Second Shareholders' Agreement provided that it would be nullified in the event of the dissolution of the firm.  At the time the Second Shareholders' Agreement was executed, Zimmermann was a Vice President, Director, and Shareholder of GGM, and thus clearly knew that the Second Shareholders' Agreement contained the provision which he now challenges.  Indeed, while Zimmermann on appeal attempts to confuse this issue by lecturing on the difference between express and implied waiver, we find that he expressly waived his rights under the Second Shareholders' Agreement to have his shares repurchased when he knowingly voted for a Plan of Dissolution which terminated the prior agreement.  Both courts below found likewise, and we therefore hold that the bankruptcy court did not commit clear error with respect to the waiver issue.

II.     *Zimmermann Was Not an Intended Third-Party Beneficiary of the Repurchase Agreement*

Zimmermann next contends that he was a third-party beneficiary to the Repurchase Agreement between GGM and TCB, apparently for the purpose of converting this issue of fact to one of law for this court to review de novo. He argues that the bankruptcy court failed to shift the burden of proof to the Trustee to demonstrate any defenses which would limit or bar a recovery by a third-party beneficiary. Although we concede that such a shift exists, and that burden of proof questions are ones of law that we review de novo, Zimmermann has again overlooked a salient fact: in order to reach the point where the burden of proof is shifted, the party claiming third-party beneficiary status must *first* demonstrate that (1) it is not privy to the written agreement; (2) the contract was actually made for its benefit; and (3) the contracting parties intended the third party to benefit by it. See Zimmermann, 1998 WL 223706, *4; Hellenic Inv., Inc. v. Kroger Co., 766 S.W.2d 861, 864-65 (Tex. Ct. App. 1989, no writ). As the district court observed, this burden is a heavy one, see Missouri Pac. R.R. Co. v. Harbison-Fischer Mfg., 26 F.3d 531, 540 (5th Cir. 1994), but Zimmermann made little to no effort to meet it: he offered his trial testimony and two questionable trial exhibits to establish his status as a third-party beneficiary.

As the district court found, his bald assertions at trial that he was a third-party beneficiary and the fact that GGM obtained shareholders' consent prior to executing the Repurchase Agreement, do not suffice to meet his burden. Indeed, they represent virtually no evidence at all. Although one division of the Texas Court of Appeals has held that once "some" evidence is proffered to establish standing as a third-party beneficiary, "it is incumbent on the opposite party to prove any defense that would limit or bar recovery," Maranatha Temple, Inc. v. Enterprise Prods. Co., 893 S.W.2d 92, 101 (Tex. Ct. App. 1994, writ denied), we do not find that the bankruptcy court's conclusion that

8

Zimmermann's evidence is utterly lacking in merit to be clearly erroneous. Even if we did find error, we would not reverse because the Trustee presented ample evidence at trial that GGM and TCB did not intend for Zimmermann to be a third-party beneficiary. Consequently, we affirm the district court's judgment with respect to Zimmermann's argument that he was an intended third-party beneficiary to the Repurchase Agreement.

III.     *TCB Was Not Required to Retain Zimmermann's Collateral in Full Satisfaction of His Debt*

Zimmermann's argument on the issue of TCB's treatment of his collateral is interesting but meritless. Zimmermann relied on Tanenbaum v. Economics Lab., Inc., 628 S.W.2d 769, 771-72 (Tex. 1982) for the proposition that a secured creditor must either keep its collateral or sell it, and, because TCB retained the collateral, it elected to do so in complete satisfaction of its debt. While Zimmermann's argument is plausible because Tanenbaum is somewhat confusing on the issue, we believe, however, that the district court correctly interpreted Tanenbaum and that the Trustee could have elected to do exactly what he did: retain the collateral and sue on the debt.

The district court held, and we agree, that the "sole issue" in Tanenbaum was "whether the retention of the collateral in a secured transaction, without notice to the debtor, bars a suit for a deficiency." Id. at 770. The Texas Supreme Court, applying §§ 9-504 and 9-505 of the Uniform Commercial Code ("UCC"), went on to observe that "the intent of the Legislature . . . was to put the creditor to an election to either sell the repossessed collateral . . . or to retain the collateral in complete satisfaction of the debt." Id. at 771-72. The Court was, however, speaking only to instances where the creditor *chooses* either to sell or to retain the collateral. As the court below decided, we do not believe that the Texas Supreme Court intended to hold that these are the only options available to a creditor because to do so would have ignored another provision of the Texas

9

Business and Commerce Code. Section 9.501(a) provides that a creditor may "reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." TEX. BUS. & COMM. CODE ANN. § 9.501(a) (West 1991). The Trustee has made no effort to foreclose on the collateral, and, according to TCB's records, the collateral was returned to Zimmermann in 1994. Consequently, nothing prohibits the Trustee from suing on the indebtedness itself.

Indeed, although Zimmermann criticizes the holding, one division of the Texas Court of Appeals has recently decided this very issue. In Schmid v. Texas Commerce Bank-Fort Worth, 912 S.W.2d 845 (Tex. Ct. App. 1995, writ denied), the court framed the issue before it as "whether the [creditor] was required under article 9 of the Business and Commerce Code to sell or otherwise dispose of the pledged stock prior to maintaining an action to recover a judgment against [the debtor] for the balance owed under the promissory note." Id. at 846. This situation is factually similar to the one presented to us in Zimmermann's case.

The Schmid court answered the question that it posed by holding that a creditor was not required to foreclose and sell the collateral before suing on the note. See id. at 847. We believe that the implication of Schmid—that if a secured creditor elects not to foreclose on stock and sell it before suing on a note, the creditor's retention of the stock does not constitute complete satisfaction of the debt—is the best way to read the cumulative sections of the UCC. In the case before us, we agree with the district court that TCB's possession of the stock did not constitute an election to retain the shares in satisfaction of Zimmermann's indebtedness. After GGM purchased the Note from TCB, the Trustee elected to sue on the note rather than retaining or selling the collateral. The law allows the Trustee to make such a choice, and we therefore find no error on this issue.

IV.    *Zimmermann's Procedural Arguments Lack Merit*

Zimmermann argues to us, as he did to the district court below, that the Trustee failed to plead and prove all conditions precedent to prove a suit on the Note, pursuant to FED. R. CIV. P. 9(c). We hold that Zimmerman waived this issue by failing to include it in his statement of issues to be presented on appeal to the district court.  See In re Freeman, 956 F.2d 252, 255 (11th Cir. 1992) (citing Energrey Enters., Inc. v. Oak Creek Energy Sys., Inc., 119 B.R. 739, 741 (E.D. Cal. 1990)); see also In re National Lumber & Supply, Inc., 184 B.R. 74, 79 (Bankr. 9th Cir. 1995) (holding by the Bankruptcy Appellate Panel of the Ninth Circuit that "[a]n issue is considered waived if it was not listed in the statement of issues to be presented, as required by Fed. R. Bankr. P. 8006").

Although we have not directly ruled on this issue before, we have previously observed in a footnote that the failure of a bankruptcy appellant to designate issues as required by Bankruptcy Rule 8006 resulted in a waiver of those issues.  See Stanford v. Butler, 826 F.2d 353, 354 n.2 (5th Cir. 1987).  We today explicitly adopt that reasoning and hold that, even if an issue is argued in the bankruptcy court and ruled on by that court, it is not preserved for appeal under Bankruptcy Rule 8006 unless the appellant includes the issue in its statement of issues on appeal.  Zimmermann failed to do so, and we thus hold that he may not raise the 9(c) claim in this appeal.

Lastly, Zimmermann contends that GGM and TCB violated the bankruptcy court's May 1993 order when GGM did not repurchase the shares at issue from TCB.  As with the 9(c) argument, Zimmermann failed to identify this issue as one of his issues on appeal, and we thus will not consider it further.  We note in passing that the bankruptcy court did not err by failing to vacate its May order when it issued its June 1993 order.  The May order was interlocutory in nature, and thus the bankruptcy court retained the authority and discretion to modify its requirements.

11

## CONCLUSION

For the reasons enumerated in the foregoing opinion and in the opinion of the district court below, we affirm the judgment of the district court affirming the entry of final judgment against Zimmermann.

AFFIRMED.