United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 17, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-20965

_____

LILLIE SLAUGHTER-COOPER, M.D.,

Plaintiff - Appellant,

versus

KELSEY SEYBOLD MEDICAL GROUP P.A.,

Defendant - Appellee.

----------------------
Appeal from the United States District Court for the Southern
District of Texas, Houston Division

---------------------

BEFORE SMITH, WIENER, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Lillie Slaughter-Cooper, M.D., ("Doctor"),
a physician formerly employed by Defendant-Appellee Kelsey-Seybold
Medical Group P.A. ("the Clinic"), appeals from the district
court's denial of her partial motions for summary judgment and
grant of the Clinic's motion for summary judgment, dismissing with
prejudice her claims for breach of contract, retaliatory discharge
under the Family Medical Leave Act ("FMLA"),[1] defamation, and
tortious interference with business relations.  We affirm.

_____

[1] 29 U.S.C. § 2601, et seq.

## I. FACTS AND PROCEEDINGS

The facts underlying this appeal are not in dispute. The Clinic hired Doctor in September 1997 as a family practice physician at its Quail Valley Clinic in Missouri City, Texas. In that month, the parties entered into an agreement which defined the terms and conditions of Doctor's employment at the Clinic. This employment agreement specified several ways that it could be terminated, three of which are at issue in this appeal.[2] First, either party could terminate the agreement without cause by providing written notice to the other at least thirty days prior to Doctor's "last day of patient care." Second, the Clinic could terminate the agreement without cause and without prior notice but with thirty days pay to Doctor. Third, the agreement would terminate automatically if, inter alia, Doctor was unable to work, because of a disability, for a period exceeding three calendar months:

> In any event, this Agreement is automatically terminated upon . . . your disability lasting longer than three (3) calendar months that prevents you from performing the essential functions of your position with or without accommodation (unless the [Clinic] reviews the circumstances and grants written waiver of termination).[3]

---

[2] The fourth ground for termination, gross misconduct on the part of Doctor, is not relevant to this appeal, as her work performance has never been at issue.

[3] In addition to such a protracted disability, "mutual consent, the suspension, revocation, restriction, or cancellation of [Doctor's] right to practice [her] profession, [or her] death" would cause the automatic termination of the agreement.

Doctor began practicing medicine at the Clinic's Quail Valley location in October 1997.  On November 7, 2000, she was injured in a non-work-related accident.  She returned to the Clinic on the day of the accident, but she began to feel disoriented while performing her duties and left shortly thereafter.  Doctor subsequently sought medical treatment from a fellow Clinic physician who diagnosed her with a concussion.

After Doctor had been absent from work for almost a month because of her injury, she received a letter dated December 1, 2001, from the Clinic's Director of Human Resources, Susan Moore ("Moore"), outlining the benefits that Doctor was entitled to receive under the Clinic's Family Medical Leave ("FML") policy. Moore's letter explained that Doctor's leave time under the Clinic's FML had commenced on November 8, 2000, the first day of her absence from work because of disability, and would expire twelve weeks later, on January 31, 2001.  Moore's letter also cautioned that

> [d]uring the FML, your job as a Family Practitioner at a Kelsey-Seybold Clinic site and your right to your current benefits are protected; however, <u>at the end of the 12 week period, we cannot commit to any position reinstatement</u>.  (emphasis added)

Soon after receiving Moore's letter, Doctor applied for and began receiving benefits under the Clinic's FML policy.

On February 15, 2001, more than two weeks after the expiration of Doctor's FML period, Moore sent a second letter to Doctor.  In this letter, Moore informed Doctor that the Clinic had "placed

3

[her] employment in 'inactive' status" effective February 1, 2001 (which was after the expiration of her FML period). This "inactive" status period, advised Moore, was "a benefits continuation period during which [Doctor] could retain [her] clinic subsidized health insurance options" but "did not include a commitment to reinstatement" (emphasis added). Moore concluded by stating:

> Your benefit continuation period (inactive status) can continue until April 30, 2001. Please understand that the clinic cannot make a commitment to reinstate you when you are able to return to work. Should you still be unable to return to work after April 30, your employment with the clinic will be terminated (emphasis added).

On March 8, 2001, Doctor's treating physician notified Dr. James Hoyle ("Dr. Hoyle"), the Clinic's medical director of operations, that Doctor would be able to resume her responsibilities at the Clinic on April 1, 2001. In response, Dr. Hoyle sent Doctor a third (and final) letter on March 26, 2001. In it, Dr. Hoyle stated that, although he was pleased to learn of her improved condition, "due to patient needs," the clinic had been unable to hold her position "beyond the beginning of March" and had since filled the position. As there would be no position available for Doctor on the day she was scheduled to return to work, wrote Dr. Hoyle, her employment would be considered terminated as of that date:

> Under the terms of your employment agreement with the Clinic, this letter will serve as 30 day written notice of your termination with [the] Clinic. The effective

4

date of termination will be April 1, 2001 which is consistent with your release to return to work.

On April 12, 2001, Dr. Hoyle sent a letter to Doctor's patients notifying them that she had "resigned from [the] Clinic, effective April 1, 2001[] . . . to pursue other professional interests." This letter identified the Clinic's physicians who were available to take over their medical care. Doctor eventually opened her own family medical practice in August 2001.

On September 28, 2001, Doctor filed suit in Texas state court alleging, inter alia, that the Clinic had (1) breached the employment agreement, (2) defamed her by making false statements, orally and in writing, to her patients regarding the circumstances surrounding her termination, and (3) tortiously interfered with her prospective business relations with patients.[4] One year later, Doctor amended her complaint to add a claim for retaliatory discharge under the FMLA. The Clinic then removed the action to federal court.

In the district court, Doctor filed separate motions for partial summary judgment on her claims for breach of contract and defamation. The Clinic responded to each of her motions and filed its own cross-motion for summary judgment on all of Doctor's

---

[4] Doctor's allegations that the Clinic (1) defamed her in letters sent to insurance providers, and (2) tortiously interfered with her existing contracts with patients and insurance providers and her prospective contracts with insurance providers were not briefed on appeal and are therefore considered abandoned. See Sepulvado v. CSC Credit Servs., 158 F.3d 890, 897 n.7(5th Cir. 1998)(claims not briefed on appeal are considered abandoned).

claims.  In February 2003, the district court referred the matter to the magistrate judge.  After considering the parties' respective motions for summary judgment, the magistrate judge recommended that the district court deny Doctor's motions for partial summary judgment and grant the Clinic's motion as to all of Doctor's claims other than her state law slander claim.  The magistrate judge recommended dismissal of that claim without prejudice to Doctor's reurging it in state court.[5]  The district court adopted the magistrate judge's recommendation in its entirety and entered an order of dismissal.  Doctor timely filed a notice of appeal.

## II. ANALYSIS

A. Standard of Review

We review de novo a district court's grant of summary judgment.[6]

B. Breach of Contract

---

[5] Doctor's slander claim was premised on four remarks allegedly made by employees of the Clinic to Doctor's patients following her termination.  The district court found that all but one of these remarks were not defamatory as a matter of law and granted the Clinic's motion for summary judgment as to Doctor's defamation claim insofar as it was premised on those three remarks. It denied the Clinic's motion, however, as to the fourth remark alleged —— a statement attributed to an unnamed Clinic employee that Doctor had "suffered brain damage" —— and dismissed her slander claim, insofar as it was based on this remark, without prejudice to reurge it in state court.  The Clinic has not appealed this ruling, so we do not address it.

[6] See Markos v. City of Atlanta, 364 F.3d 567, 570 (5th Cir. 2004).

6

Doctor argues that the Clinic breached the employment agreement by failing to provide her either thirty-days' written notice prior to her last day of patient care or thirty-days' pay following her termination. In response, the Clinic asserts that neither written notice nor termination pay was required in this instance, as the employment agreement terminated ipso facto on February 8, 2001, by virtue of the automatic termination provision; specifically, as a result of Doctor's "disability lasting longer than three (3) calendar months [that] prevent[ed] her from performing the essential functions of [her] position."

Although Doctor concedes that her extended absence would normally have triggered the employment agreement's automatic termination provision, she contends that the Clinic waived its right to assert automatic termination of the employment agreement through its own words and conduct — more specifically, its representations to Doctor in its February 15, 2001 and March 26, 2001 letters regarding her termination date. Doctor emphasizes the fact that both letters refer to the termination of her employment as occurring sometime in April 2001, well over a month after the automatic termination date of February 8, 2001:[7]  In the February

---

[7] In the district court, the parties disputed the precise date on which the agreement would terminate automatically — in the absence of waiver — as a result of Doctor's inability to return to work for a period exceeding three months:  The Clinic maintained that the employment agreement terminated automatically on February 1, 2001, the day after Doctor's twelve week FML period expired; Doctor argued that the date of automatic termination would have been February 6, 2001.  The district court assumed, without

7

15, 2001 letter, Moore cautioned Doctor that her employment "will be terminated" if she is "still unable to work <u>after</u> <u>April 30</u>."(emphasis added)  Likewise, in the March 26, 2001 letter, Dr. Hoyle advises her that "[t]he effective date of termination <u>will</u> <u>be</u> <u>April 1, 2001</u> . . . ." (emphasis added)  These statements, asserts Doctor, show that the Clinic still considered her an employee of the Clinic after the date for automatic termination of the employment agreement had passed, thereby evidencing the Clinic's intent to waive the automatic termination provision.

Doctor is correct that the element of "intent" is typically the "prime factor" in determining whether a waiver of a contractual right has occurred.[8]  It is unnecessary to reach the question of intent in this case, however, as we conclude that Doctor has failed to show, as a matter of law, that there was still "an existing right" susceptible of being waived by The Clinic at the time the alleged acts of waiver occurred.  Under Texas law, "waiver is a voluntary, intentional relinquishment of a known right or

_____

deciding, that February 6, 2001 was the date of automatic termination, reasoning —— correctly —— that the five-day discrepancy did not affect the outcome of its decision. On appeal, however, the Clinic has made clear that it accepts February 8, 2001 (the date asserted by Doctor on appeal as the date of automatic termination in the absence of waiver) as the date of automatic termination, for purposes of this appeal only.  Thus, we assume, <u>arguendo</u>, that, absent waiver, the employment agreement terminated automatically on February 8, 2001 —— three calendar months from the first day that Doctor was absent from work because of her injury.

[8] <u>Id.</u>

8

intentional conduct inconsistent with claiming the right."[9]  The party claiming waiver (Doctor) must show, as to the party asserting a right (the Clinic), "(1) an <u>existing</u> <u>right</u>, benefit, or advantage; (2) knowledge, actual or constructive, of its existence; and (3) actual intent to relinquish the right, which can be inferred from conduct."[10]  Here, the facts surrounding the alleged acts of waiver — i.e., the contents of the February 15 and March 26 letters — are not in dispute, so the issue of waiver of the automatic termination provision is a pure question of law for us to decide.

The Clinic's "right" — automatic termination of the employment agreement when Doctor's absence exceeded three calendar months — was contractual in nature, stemming solely from the terms of the agreement.  Once that agreement terminated automatically, on its terms, all rights and obligations arising from that agreement — including the Clinic's right either to rely on or waive the automatic termination provision — evaporated along with the agreement.  That occurred on February 8, 2001, at the latest.

---

[9] <u>First Interstate Bank, N.A. v. Interfund Corp.</u>, 924 F.2d 588, 595 (5th Cir. 1991)(citing <u>Edwin M. Jones Oil Co. v. Pend Oreille Oil & Gas Co.</u>, 794 S.W.2d 442, 447 (Tex. App. — Corpus Christi 1990, writ denied)).

[10] <u>Id.</u>(citing <u>Missouri-Kansas-Texas R.R. v. Heritage Cablevision of Dallas, Inc.</u>, 783 S.W.2d 273, 280 (Tex. App. — Dallas 1989, no writ)(emphasis added).  "Although waiver is ordinarily a question of fact, when the facts and circumstances are admitted or clearly established, the question becomes one of law." <u>Motor Vehicle Bd. of the Texas Dept. of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.</u>, 1 S.W.3d 108, 111 (Tex. 1999).

Thus, by February 15, 2001, the date of the Clinic's first purported act of waiver, neither party possessed rights under the employment agreement, without which there was nothing susceptible of waiver. It follows that the Clinic did not — because it could not — waive its right to rely on automatic termination of the employment agreement by the representations in its February 15 and March 26, 2001 letters to Doctor. As those representations were made <u>after</u> the agreement had terminated automatically by or before February 8, 2001, the contractual right to rely on automatic termination no longer existed, making waiver of that right a legal impossibility.

Once the employment agreement had thus terminated, no subsequent behavior on the Clinic's part, regardless of how inconsistent with reliance on the right such behavior might appear, could breathe life back into the dead contract.[11] True, the parties could have overtly acted to create a new contract, but they must have done so in clear, express, and unequivocal language of novation. They could not, however, resuscitate the terminated employment agreement. We hold that the district court correctly granted summary judgment in favor of the Clinic on this claim.[12]

---

[11] Indeed, the Clinic's actions to which Doctor refers as waiver clearly appear to be gratuitous acts of kindness in unilaterally extending her medical coverage— yet another example of the maxim that no good deed goes unpunished.

[12] For essentially the same reason, Doctor's assertion that the Clinic waived its right to assert automatic termination of the employment agreement in its responses to her interrogatories is

C.   Retaliatory Discharge, Defamation, and Tortious Interference
     with Prospective Business Relations

Doctor's remaining claims are equally unavailing.  To establish a prima facie case of retaliatory discharge, a plaintiff must show, inter alia, that a "causal link" exists between the protected activity and the discharge.[13]  Although she asserts that the Clinic discharged her in retaliation for the exercise of her rights under the FMLA,[14] Doctor has produced no probative evidence of a "causal link" between her exercise of those FMLA rights and the termination of her employment, much less any evidence that the Clinic's proffered reason for firing Doctor — the automatic termination of her employment agreement — was a pretext for unlawful discrimination.

_____

without merit.  The interrogatories were asked and answered long after the employment agreement terminated on its own terms.

   [13]  Hunt v. Rapides Healthcare Sys. LLC, 277 F.3d 757, 769 (5th Cir. 2001)(McDonnell-Douglas framework applies to claims for retaliatory discharge under the FMLA).  An internal Clinic email offered by Doctor as evidence of pretext, when considered in context, establishes  nothing more than the Clinic's desire to follow proper procedures in handling the circumstances surrounding Doctor's extended absence.

   [14]  FMLA requires employers to provide up to twelve weeks' unpaid leave to any eligible employee who suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Chaffin v. John H. Carter Co., 179 F.3d 316, 319 (5th Cir. 1999)(citing 29 U.S.C. § 2612(a)(1)(D)); see also Hunt, 277 F.3d at 762-63.  After a qualifying absence, the employer must restore the employee to the same position or a position comparable to that held by the employee before the leave. See id.  The employer may not "interfere with, restrain, or deny the exercise of . . . any right provided under the FMLA." 29 U.S.C. § 2615(a)(2).

11

Likewise, Doctor's defamation claim based on the Clinic's representations to her former patients cannot succeed. This claim is premised, in part, on statements allegedly made by some of the Clinic's employees, in response to patient inquiries, that Doctor (1) had quit the practice of medicine, (1) was unable to practice medicine, and (3) had moved out of the state. Because, at the time of her termination, Doctor entertained no other professional interests, she also grounds her defamation claim in part on Dr. Hoyle's statement in the April 12, 2001 letter to her patients that Doctor had "resigned from [the] Clinic, effective April 1, 2001 . . . to pursue other professional interests." Even though these statements may not be literally true, they are, at the very least, substantially true, and therefore not defamatory.[15]

Furthermore, Texas law provides that statements made by employees of a medical employer to the patients of a former employee-physician for the purpose of explaining the whereabouts of such former employee are protected by a qualified privilege that

---

[15] See Dolcefino v. Randolph, 19 S.W.3d 906, 917 (Tex. App. — Houston [14th Dist.] 2000, pet. denied)(statement substantially true when not more damaging to claimant's reputation, in mind of average listener, than truthful statement would have been); Gulf Constr. Co. v. Mott, 442 S.W.2d 778, 784 (Tex. Civ. App. — Houston [14th Dist.] 1969, no writ)(under Texas law, "[s]ubstantial truth of the statements complained of is a complete defense to an action [for defamation]"). See also Wehling v. Columbia Broad. Sys., 721 F.2d 506, 509 (5th Cir. 1983)("[A] statement that is substantially true is not defamatory.").

12

can only be overcome by a showing of actual malice.[16] As Doctor has offered no probative evidence that would tend to show that the alleged defamatory statements were made with actual malice, the district court was correct in granting summary judgment in favor of the Clinic on this claim.

Finally, Doctor's claim of tortious interference with prospective business relations fails as a matter of law. To state such a cause of action under Texas law, a claimant must show, inter alia, that (1) "the defendant's conduct was independently tortious or wrongful" and (2) "[she] suffered actual harm or damage as a result of the defendant's interference."[17] Although we agree with Doctor that the Clinic's conduct was "independently tortious,"[18] we

---

[16] See E. Tex. Med. Ctr. Cancer Inst. v. Anderson, 991 S.W.2d 55, 61 (Tex. App. — Tyler 1998, pet. denied)(statements made by clinic employees to patients of physician who had recently had his clinic staff privileges revoked were subject to a qualified privilege; clinic "had an interest in explaining [the physician's] absence to his patients [and] patients . . . had a corresponding interest in learning the same information about their doctor"); see also Duffy v. Leading Edge Prods., 44 F.3d 308, 312 (5th Cir. 1995)(showing of actual malice required to overcome qualified privilege).

[17] Allied Capital Corp. v. Cravens, 67 S.W.3d 486, 490 (Tex. App. — Corpus Christi 2002, no pet.)(citing Baty v. ProTech Ins. Agency, 63 S.W.3d 841, 859-60 (Tex. App. — Houston [14th Dist.] 2001, pet. denied)).

[18] As noted above, the district court denied the Clinic's motion for summary judgment as to Doctor's claim for slander insofar as it was based on the alleged statement by employees of the Clinic that Doctor had "suffered brain damage," and dismissed it without prejudice to Doctor's reurging it in state court. This surviving claim for slander, which the Clinic chose not to appeal, thus provides an adequate basis for Doctor's tortious interference claim.

nevertheless conclude that Doctor has failed to demonstrate actual harm resulting from this remark. Her argument is that, were it not for this remark, many of her patients would have "sought her out" once she opened her own practice. Given the lapse of time between the date in April 2001 on which the statement was purportedly made and the time in August of that year when Doctor resumed the practice of medicine, her contention is simply too speculative to raise a genuine issue of material fact on the element of actual harm. Accordingly, we affirm the district court's grant of summary judgment dismissing Doctor's tortious interference claim.

### III. CONCLUSION

As a matter of law, the Clinic could not waive its right to the automatic termination of the employment agreement by acts after that agreement had already terminated automatically in accordance with its express terms. We therefore affirm the district court's grant of summary judgment in favor of the Clinic, dismissing Doctor's claim for breach of the employment agreement. We also affirm the district court's grant of summary judgment dismissing Doctor's claims for retaliatory discharge under the FMLA, defamation, and tortious interference with prospective business relations, because she failed to establish that a genuine issue of material fact exists as to each of these claims. Accordingly, the district court's decision is, in all respects,
AFFIRMED.

14